**William KILBURN, Jr., and Lora Kilburn, Plaintiffs–Appellants,**

v.

**UNITED STATES of America, Defendant–Appellee.**

No. 90–6280.

United States Court of Appeals, Sixth Circuit.

Argued May 24, 1991.

Decided July 15, 1991.

Kathryn Burke, Pikeville, Ky., Walter A. Oleniewski (argued), Ashley J. Gardner, Shulman, Rogers, Gandal, Pordy & Ecker, Rockville, Md., for plaintiff-appellant.

Robert E. Rawlins (argued), Asst. U.S. Atty., Office of the U.S. Atty., Lexington, Ky., for defendant-appellee.

Before MERRITT, Chief Judge, and GUY and RYAN, Circuit Judges.

RALPH B. GUY, JR., Circuit Judge.

Plaintiff, William Kilburn,[1] appeals from the district court's denial of his Federal Tort Claims Act claim for negligent medical and dental treatment by practitioners at the Veteran's Administration facilities in Louisville and Lexington, Kentucky.

Plaintiff asserts that the district court erred (1) by mechanically adopting the defendant's proposed findings of fact and conclusions of law; (2) by failing to articulate facts in support of its ultimate conclusions as required by Federal Rule of Civil Procedure 52(a); (3) by failing to rule on all significant issues as required by Federal Rule of Civil Procedure 52(a); (4) by adopting clearly erroneous findings of fact; (5) by applying incorrect legal standards; and (6) by abdicating its role as a judicial fact finder and, as a result, violated plaintiff's constitutional right to due process. We find plaintiff's arguments without merit and, accordingly, affirm.

The following is a chronology of the events leading up to the removal of plaintiff's mandible, the treatment for plaintiff's osteoradionecrosis.

## I.

In October 1982, William Kilburn, an Army retiree, was diagnosed with cancer. Several weeks thereafter, he went to the Otolaryngology (ENT) Clinic, Veterans Ad-

---

1. Lora Kilburn, the plaintiff's wife, also brought a derivative claim for loss of consortium.

ministration Medical Center (VAMC) in Louisville, Kentucky. At the Louisville VAMC, Kilburn had a right radical neck dissection. At this time, it was determined that the primary site of the carcinoma was at the base of his tongue.

After the surgery, as part of the continuing treatment for his cancer, Kilburn required radiation treatments. Because the radiation treatments could affect his teeth, the ENT clinic referred Kilburn to a dental clinic, at the same location, for an assessment, before he received any radiation treatments.

Dr. Benny Dukes, Chief of Service, conducted an examination and Dr. Marcus Beyerle, who was under the supervision of Dr. Dukes, conducted a subsequent examination. Although these doctors found that Kilburn had a temporary problem with dental hygiene, because in the several days since the neck dissection he did not brush his teeth, they found that his teeth were generally salvageable. Thus, no extractions prior to radiation treatments were necessary.

As part of this so-called pre-irradiation assessment, an x-ray was taken of Kilburn's teeth. This x-ray was not available at the time of trial, however. The Government claimed that it had been recycled sometime prior to trial pursuant to VA regulations.

As part of the regular course of procedure, Kilburn met with a dental hygienist the day after the pre-irradiation assessment. The hospital records indicate that Kilburn met with dental hygienist Barbara Knable. Although the dental hygienist had no specific recollection of the instructions she gave Kilburn, her usual habit for patients in Kilburn's position was to instruct them on procedures for good dental hygiene, including the application of daily fluoride treatments.[2] (Fluoride mineralizes the surfaces of the teeth, thus protecting them from the effects of radiation and from the effects of dry mouth, a common

condition accompanying radiation.) At the first meeting, Knable's standard practice was to give patients a one-month supply of fluoride. Additional supplies could be obtained only through the VA dental clinic.

Also, Knable administered a recall system, which served to inform patients when to return for additional dental treatments. Although Knable kept track, via a patient-specific index card, of when patients were sent postcards telling them to return for more or follow-up treatment, the index card for Kilburn was missing at the time of trial. The district court found it probable that the index card with information on Kilburn was disposed of pursuant to VA operating procedures.

Thereafter, Kilburn began receiving radiation treatments. He did not return to the VA dental clinic in either 1983 or 1984. He did, however, go to his monthly checkups at the ENT clinic.

In February of 1984, Kilburn received treatment from a private dentist, Dr. Edford Clark. Dr. Clark determined that 14 teeth required restoration. Thirteen of the 14 teeth were upper, or maxillary teeth, and one tooth, tooth number 21, was a mandibular tooth. As part of his dental examination of Kilburn, Dr. Clark took an x-ray. This x-ray was admitted into evidence.

At Kilburn's request, Dr. Clark sent a proposal to the VA asking for authorization to bill the VA for the restorations. The VA responded with the following form letter, dated April 17, 1984, which read, in pertinent part: "[Y]ou have no dental compensable service-connected disabilities, nor are you eligible for outpatient dental treatment under other laws administered by the Veterans Administration." Kilburn asserts that he interpreted this letter to mean that he was not entitled to receive any dental care from the VA. The district court, however, found that the letter merely indicated that Kilburn was not eligible "for dental service by a private dentist on a 'fee ba-

---

**2.** The district court found that "Kilburn admitted that he knew how to use the fluoride, admitted that he knew the function and purpose of the daily fluoride use and admitted that he was

given oral hygiene instructions pertaining to the daily fluoride patient self care program on numerous occasions by several different persons."

sis.'" Further, the district court concluded that "as a head and neck radiation patient, Mr. Kilburn would have always have granted continuation of care dental service at any VA facility."

After he received the letter, Kilburn contacted the VA and learned that he could obtain VA dental benefits if he enrolled in a vocational rehabilitation program. Kilburn did so. As the district court observed, "[d]espite his acceptance in the vocational rehabilitation program in early June 1984, Mr. Kilburn did not seek VA dental care until he appeared in Lexington on August 13, 1984."

On August 13, 1984, Kilburn was examined by Dr. Terrence Nudd at the VA dental clinic in Lexington. Dr. Nudd concluded that Kilburn had not been following the daily fluoride regimen. Dr. Nudd again advised Kilburn of the necessity of good dental hygiene.

On September 9, 1984, Kilburn returned to the dental clinic at Lexington. Because one of Kilburn's teeth, tooth number 24, had decayed at the gum line, it was extracted by Dr. Bradley Roberts. Dr. Roberts, an oral surgery resident, was under the supervision of Dr. Robert Marciani. After Kilburn's tooth was extracted, no antibiotic coverage was prescribed.

On December 11, 1984, Kilburn again returned to the Lexington dental clinic. He was diagnosed with an irreversible pulpitis in molar tooth number 32 and this tooth was subsequently extracted. Antibiotics were administered in conjunction with the removal of this tooth.

Kilburn went to the VA dental clinic next on March 20, 1985, for an appointment at the ENT clinic. There, Kilburn reported that he had a cracked lower tooth. He was referred to a doctor at the Louisville dental clinic, where he was seen that same day by Dr. Shaughnessy. Kilburn had continued to fail to follow procedures for good dental hygiene. He was again informed of the necessity of maintaining a good dental hygiene routine.

Throughout 1985 Kilburn was seen at the Louisville dental clinic. Occasionally, however, he would fail to make his scheduled appointments. In fact, after missing an appointment on January 3, 1986, he went to the clinic on January 24, 1986. Again, he went to the clinic because he was experiencing problems. Again, it was evident to the doctor, Dr. Shaughnessy, that Kilburn still was not practicing good dental hygiene. Again, Shaughnessy emphasized the need for good dental hygiene. "Kilburn complained of generalized pain in the mandibular arch and swelling in the anterior mandible around teeth 23 and 25. Teeth 23 and 25 were found to have otodonic abscesses and were treated with root canal therapy." This treatment was not successful, however, and the infection persisted. Finally, on February 10, 1986, several of Kilburn's teeth were extracted. At this time, an area of necrotic bone was discovered in Kilburn's left mandible. The necrotic bone was treated with debridgement and irrigation. With this treatment Kilburn's condition demonstrated some improvement.

This treatment continued and was effective until late May 1986. Because Kilburn's osteoradionecrosis was progressing, however, Kilburn's doctors then enrolled him in a new program at the Dayton VAMC to receive hyperbaric oxygen therapy. On June 20, 1986, Kilburn was admitted to the Oral Surgery Service at the Dayton VAMC. His daily hyperbaric oxygen treatments began on June 24, 1986. Kilburn was instructed not to smoke because it would undermine the benefits of his hyperbaric oxygen treatments. He continued to do so anyway. Because the hyperbaric oxygen treatments were ineffective, it became necessary to remove Kilburn's mandible by procedures performed in August and September of 1986.

In April of 1987, because Kilburn had difficulty getting nutrition, the VA doctors inserted a gastronomy tube into his body. The district court found that Kilburn's rate of weight loss was the greatest "immediately after his cancer surgery and irradiation in 1983." The district court noted that "his lowest recorded weight occurred in September 1983 at 141½ lbs."

In October of 1987, Kilburn filed suit against the United States under the Feder-

al Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671–2680. Kilburn alleged that the defendant, through its agents and employees, 1) "knew or should have known that the administration of radiation therapy to Mr. Kilburn's tongue, without first removing his teeth, would likely result in osteoradionecrosis of the mandible, radiosteomyelitis and the complete destruction of Mr. Kilburn's teeth and jaw"; 2) "breached the standard of care by administering an extensive course of radiation therapy to [his] tongue without first removing his teeth"; 3) "subsequently abandoned Mr. Kilburn and wrongfully refused to treat the radiation decay and agonizing pain Mr. Kilburn suffered as a direct result of the radiation therapy"; 4) "extracted two teeth from Mr. Kilburn between September 19, 1984 and November 12, 1984 without providing antibiotics, endodontic treatment or follow-up care"; and 5) "negligently failed to inform Mr. Kilburn of the known risks of administering radiation therapy without first removing his teeth and thereby prevented him from giving informed consent to such treatment."

A six-day bench trial ensued. At its conclusion, in lieu of closing arguments, the district court asked the parties to submit post-trial briefs with proposed findings of fact and law. Both sides submitted them in February 1990.

On March 14, 1990, Kilburn filed a motion to strike the testimony of one of the government's expert witnesses, Dr. Mainous. Kilburn asserted that Dr. Mainous' testimony in another suit, regarding the applicable standard of care for extracting teeth from an irradiated mandible, conflicted with his testimony in Kilburn's case.

On July 31, 1990, the district court denied Kilburn's motion to strike and entered judgment in favor of the United States.

Kilburn appealed.

## II.

Kilburn asserts that the district court abdicated its independent judicial fact-finding function by mechanically adopting the findings of fact and conclusions of law submitted by the United States attorney.

Thus, he argues the district court committed prejudicial error and this action should be remanded for a new trial. In the alternative, Kilburn argues that, at a minimum, we should give the district court's findings less weight than we normally would.

The crux of Kilburn's argument is that the district court failed to comply with Federal Rule of Civil Procedure 52(a). Rule 52(a) reads, in pertinent part, as follows:

(a) **Effect.** In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon.... Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses....

Appellate courts generally frown on the wholesale adoption by the district court of findings of fact and conclusions of law submitted by one of the parties. *See Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395, 1407 (D.C.Cir. 1988) (per curiam), *reh'g*, 852 F.2d 619 (D.C.Cir.1988), *cert. denied*, 490 U.S. 1105, 109 S.Ct. 3155, 104 L.Ed.2d 1018 (1989); *Andre v. Bendix*, 774 F.2d 786, 800 (7th Cir.1985). Even the Supreme Court has expressed its displeasure with this practice. *Anderson v. Bessemer City*, 470 U.S. 564, 572, 105 S.Ct. 1504, 1510, 84 L.Ed.2d 518 (1985).

The Seventh Circuit has held that such a practice is reviewed to determine whether the district court abused its discretion. *Andre*, 774 F.2d at 800. We believe this to be the correct standard. We do not believe that under the facts before us the district court abused its discretion by adopting the government's proposed findings of fact and conclusions of law.

First, we note that, although the district court's opinion essentially mirrors the government's proposal, the content of the two documents is not identical. Several paragraphs from the government's proposed findings of fact and conclusions of

law are not included in the district court's opinion. The district court renumbered the paragraphs accordingly. Additionally, the district court wrote its own introductory paragraph. Finally, the district court substantially expanded upon the government's conclusion and added language denying as moot the government's motion for a directed verdict.

Although the changes made by the district court were not substantial, the Seventh Circuit, under facts more problematic than those before us, held that a district court's adoption of one party's proposed findings of fact and conclusions of law was not an abuse of discretion. *Andre,* 774 F.2d at 800. In *Andre,* the district court cited "throughout its analysis to numbered 'Facts' which [were] not contained in its decision.... The court neglected to take the trouble to key its analysis to [plaintiff's] post-trial brief statement of facts which it had adopted (in lettered sections) as its findings of fact." *Id.* In contrast, in the current case the district court renumbered the paragraphs it adopted from the defendant's proposal, to make its opinion internally consistent. In *Andre,* there were also editorial alterations, as in the present case. The Seventh Circuit concluded that, "[g]iven th[e] large number of editorial alterations, [it was] at least certain that the district court read the post-trial brief before adopting it." *Id.* (citation omitted). The *Andre* court did not hold that the district court abused its discretion in adopting the plaintiff's post-trial brief as its own. Rather, its "concern ... [was] not so much with the *manner* in which the district court adopted the proposed findings, as with the *adequacy* of the findings which resulted from this adoption." *Id.* (emphasis in original). We agree. As our circuit stated long ago, "[t]he fact that proposed findings of fact, prepared and submitted by the successful attorneys, have been adopted by the trial court does

not detract from their legal force or effect. When adopted, such findings become the findings of the court, and are entitled to the same respect as if the judge ... had drafted them." *O'Leary v. Liggett Drug Co.,* 150 F.2d 656, 667 (6th Cir.), *cert. denied,* 326 U.S. 773, 66 S.Ct. 231, 90 L.Ed. 467 (1945).

Additionally, we note that our circuit, in *Woolridge v. Marlene Industries Corp.,* 875 F.2d 540 (6th Cir.1989), found that support for a special master's verbatim adoption of the defendant's proposed findings of fact and conclusions of law lay in the fact that "all parties had equal opportunity to submit proposed reports for the special master's consideration and did so." *Id.* at 544. Because both parties here also had equal opportunity to submit their proposed findings to the district court, we are even further persuaded that the district court did not abuse its discretion in substantially adopting the defendant's proposed findings of fact and conclusions of law.[3]

█ Kilburn next argues that, because the district court adopted the defendant's findings of facts and conclusions of law, we should more closely scrutinize its factual findings. We disagree. While the Supreme Court in *Anderson* discouraged verbatim adoption by district courts of a party's proposed findings of fact and conclusions of law, it still held, however, that district court findings are subject to the clearly erroneous standard: "[E]ven when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous." *Anderson,* 470 U.S. at 572, 105 S.Ct. at 1510; *see Woolridge,* 875 at 544; *Berger,* 843 F.2d at 1407–08. The D.C. Circuit offered the following reasons to support this conclusion:

> An appellate court is generally ill-equipped to conduct *de novo* reviews and the assignment of that task to courts of appeals would waste judicial resources.

---

**3.** Notably, one of the cases cited by the plaintiff for support does not admonish the verbatim adoption of a party's proposed findings of fact and conclusions of law. Rather, it refers to the practice as commonplace. "It is not unusual for the court in a non-jury case to request counsel for both parties to submit proposed findings of fact and conclusions of law, and to adopt verbatim those submitted by one of the counsel." *Hill & Range Songs v. Fred Rose Music, Inc.,* 570 F.2d 554, 558 (6th Cir.1978).

*De novo* review, moreover, would be contrary to the plain meaning of Rule 52(a), which requires courts to set aside factual findings only if they are "clearly erroneous."

*Berger*, 843 F.2d at 1407. At the same time, the court, characterizing its mission as a "Herculean task," noted that "the function of appellate review ... in a case of this sort is substantially different (and more difficult) than what is normally required." *Id.* at 1408.

### III.

Next, Kilburn argues that the district court failed to enter findings of subsidiary facts upon which to support its ultimate conclusions. Thus, Kilburn urges us to remand for a new trial. Kilburn makes this argument with respect to several issues and we will address each in turn.

█ Kilburn first argues that the district court failed to reveal why it found the defendant's experts more credible by virtue of their training, study, and professional practice than his experts. Kilburn asserts that the district court was required to enter subsidiary findings concerning those aspects of their training, study, and professional practice upon which its conclusion was based.

The district court opted to believe the experts presented by the Government for the following reasons:

> Making such credibility assessments, the Court looked to the training and experience of each expert in the areas of professional practice pertinent to the issues in this case. The Court took note of which experts were extensively and regularly involved in the medical treatment and management of head and neck tumor patients and their professional practice. The Court noted which experts write in scientific peer review journals, the subject of their expertise in this case and which experts lecture to peer groups on the management of head and neck tumor patients and the management of osteoradionecrosis. The Court also noted which experts have conducted studies pertinent to their expertise in this case. Having evaluated each of the experts on the criteria enunciated, the Court concludes that the expert witnesses offered by the United States, Drs. Mainous, Marciani and Ownby, clearly have more credibility in the areas of dispute in this case by virtue of their training, their study and their professional practice exposure to the treatment and management of osteoradionecrosis.

Although this explanation does not offer particularized reasons as to why the district court believed one expert over another, *e.g.*, that defendant's expert, Dr. Ownby, published more articles in the leading reviewed journal on the subject of osteoradionecrosis than plaintiff's expert, Dr. Speiser, such detail is not necessary to meet the requirements of Federal Rule of Civil Procedure 52(a). The district court enumerated the criteria it used to determine whom it believed. This is sufficient.

█ The district court's decision to credit the expert testimony of the defendant's experts largely determined the outcome of this case. The primary issues at trial were the etiology of Kilburn's osteoradionecrosis and the length of time traumatic, or extraction-induced, osteoradionecrosis takes to manifest itself. Generally, the thrust of the Government's defense and its expert testimony was as follows. The extractions performed by the VA doctors could not have been the genesis of traumatic osteoradionecrosis because they were performed sixteen months before the discovery of osteoradionecrosis. Additionally, osteoradionecrosis is equally likely to occur spontaneously in an individual who has no teeth, *i.e.*, if they were extracted before radiation treatments were started, as in an individual with teeth. And finally, that osteoradionecrosis is a healing defect resulting from the administration of radiation. It is, as the district court found, "not infectious in origin and it is not cured or prevented by the application of antibiotics." Because the district court adopted the defendant's view on these issues, many of the plaintiff's claims regarding the insufficiency of the district court's findings of fact and conclusions of law are immaterial.

For example, Kilburn argues that the district court failed to support its conclusion that the pre-irradiation dental assessment was within the standard of care. The crux of the plaintiff's argument is that, because Kilburn allegedly exhibited the effects of poor dental hygiene at the time of his pre-irradiation assessment, the doctors should have extracted his teeth before he received the radiation treatments. He then would not have been as prone to osteoradionecrosis as he was. Admittedly, the district court was too conclusory in its discussion of its findings on this issue. Twice the district court stated, without elaborating, that the pre-irradiation examination was within the "applicable standards of professional care." The district court concluded that Kilburn's osteoradionecrosis was not induced by trauma, or extraction. More importantly, however, the district court found that the evaluation was "not causally related to any of Mr. Kilburn's subsequent dental problems." Thus, even assuming, *arguendo*, that the doctors violated the standard of professional care, this finding becomes entirely immaterial in light of the fact that this assessment was not causally related to the plaintiff's subsequent injuries.

This rationale is also applicable to plaintiff's claims that the VA did not pursue root canal therapy with tooth 24, as opposed to extraction. Again, the district court concluded that the issue was not causally related to the plaintiff's subsequent development of osteoradionecrosis, *i.e.*, the extraction of tooth 24 was not causally related to the plaintiff's subsequent problem: "The Court finds that the extraction site healed without complication and that the extraction of tooth 24 was not causally related to the development of spontaneous osteoradionecrosis in an adjacent site sixteen (16) months later." Thus, both the choice of treatment and the standard of care with which the doctor extracted Kilburn's tooth is not material to Kilburn's subsequent development of osteoradionecrosis.

## IV.

Kilburn also asserts that the district court erred because it failed to rule on all "significant issues" as it is required to do pursuant to Federal Rule of Civil Procedure 52(a). Specifically, Kilburn asserts that the district court failed to address three pertinent issues. We will address each issue in turn.

Kilburn claims that the district court "entered no findings or conclusions with respect to [plaintiff's] claim that the osteoradionecrosis risk assessment was below the standard of care." This is simply a restatement of plaintiff's argument that the district court failed to make subsidiary findings to support its conclusion that the pre-irradiation assessment was within the applicable professional standards of care. Thus, we need only restate our reason for rejecting plaintiff's argument. That is, the district court found that the decision made in the assessment to retain plaintiff's teeth was not causally related to the plaintiff's subsequent development of osteoradionecrosis.

■ Kilburn argues that the district court failed to make findings of fact and conclusions of law on his informed consent claim. Kilburn argues that had the doctors explained the option of having his teeth extracted prior to radiation to reduce the risk of the development of osteoradionecrosis Mr. Kilburn would have agreed to the pre-irradiation extractions. Admittedly, the district court did not explicitly rule on plaintiff's claim of lack of informed consent. This was not reversible error, however, because the court did find explicitly that plaintiff's underlying supposition, *i.e.*, that the extraction of teeth would have reduced his likelihood of developing osteoradionecrosis, was not correct. As a result, plaintiff's informed consent claim falls apart. In sum, plaintiff's claim of lack of informed consent is really a challenge to the finding made by the VA doctors at his pre-irradiation assessment that his teeth were salvageable and that any dental hygiene problems found in the exam were merely transitory. This is simply a restatement of plaintiff's claim of negligence given a different label.

Additionally, Kilburn argues that the district court failed to enter sufficient findings of fact and conclusions of law with respect to the legal issues raised in his motion in limine and at trial. Specifically, Kilburn asserts that the district court failed to rule on the following legal issues:

1) whether the United States' failure to produce the 1982 X-ray and a dental recall index card for use in this litigation warranted the imposition against the United States of a rebuttable adverse inference that such information, if produced, would have been adverse to the United States; and 2) whether the United States' failure to produce as a witness the VA dentist who extracted teeth from Mr. Kilburn's irradiated mandible warranted the imposition against the United States of an adverse inference that this testimony would have been adverse to the United States.

■ Although the district court did not rule on plaintiff's motion explicitly, its findings of fact obviated the need for such a ruling. First, the district court found that "[a]ll expert testimony at trial indicated that any adverse oral health condition such as periodontal disease which might have affected the clinical judgment not to extract Mr. Kilburn's teeth in December 1982, would have been the same or more advanced at the time the Clark x-ray was taken in February 1984." Thus, because the Clark x-ray was available at trial, and because the experts testified that the Clark x-ray supported the decision made in the pre-irradiation assessment not to extract Kilburn's teeth, the unavailability of the earlier x-ray became inconsequential. If anything, the use of the Clark x-ray, as opposed to the earlier x-ray, favored the plaintiff because, in the 14–month lapse of time between the two x-rays, the plaintiff's condition could only have gotten worse.

■ Second, plaintiff argues that, because the Government did not produce the doctor who extracted Kilburn's teeth from his irradiated mandible, he was entitled to an inference that the doctor's testimony would have been adverse to the Government. This argument is also without mer-

it. As the Government aptly points out in its brief: 1) the United States did not call Dr. Roberts because his testimony would have been "cumulative to that of his attending mentor[,] Dr. Marciani"; and 2) "nothing prevented [plaintiff's counsel] from taking his deposition which could have been used at ... trial."

## V.

Kilburn also argues that many of the district court's findings of fact were clearly erroneous. We will address each of Kilburn's arguments in turn.

■ First, Kilburn challenges the district court's finding that the VA's dental hygienist, Barbara Knable, instructed Kilburn in 1982 as to the necessity and procedures for good dental hygiene. Kilburn asserts that because he testified that he was never told to return to the VA dental clinic and that he believed that he was not entitled to VA outpatient dental benefits, her testimony should not have been accepted as dispositive, particularly considering the strength of Mr. Kilburn's testimony to the contrary. The plaintiff admits that the records reflected that Knable treated Mr. Kilburn during his 1982 VA hospital admission. Although Knable did not specifically recall her meeting with Kilburn, she testified as to her usual practice at such meetings. The district court simply credited her testimony on her usual procedures, supported by the hospital record, over Kilburn's testimony. In light of the number of times Kilburn was instructed to follow a hygiene regimen by various dental clinic personnel and the evidence that Kilburn routinely disregarded such advice, it was not clearly erroneous for the district court to have credited Knable's testimony over Kilburn's.

■ Kilburn also takes issue with the district court's finding that he was told to return to the VA dental clinic for additional treatment but did not and its finding that Kilburn was never denied care at a VA dental clinic. Kilburn testified at trial that he believed that he was eligible only for inpatient dental care. As support for his belief, he points to a form letter sent to him

by the VA denying medical coverage for certain restorative work to be performed by a private dentist. Kilburn testified that he contacted the VA after receipt of this letter and found that to be eligible for dental care he needed to be in a rehabilitation program. Kilburn testified that he joined such a program and thereafter sought and received dental care at the VA facility in Lexington, Kentucky.

Kilburn fails to point out that he did not seek medical care, from either a private dentist or the VA, between February of 1983 and the receipt of the VA letter in April of 1984, which presumably fostered his belief that he was not entitled to dental benefits. Additionally, Kilburn fails to mention that after his acceptance to a rehabilitation program in June 1984 he did not seek VA dental care until he appeared in Lexington on August 13, 1984. Even after his August 1984 visit to the VA dental clinic, in which Kilburn was informed of the necessity of regular dental clinic visits, Kilburn only went to the dental clinic when he was experiencing catastrophic problems. In light of Kilburn's reluctance to receive dental care, even when it was indisputable that he thought he was entitled to receive medical care, the district court was not clearly erroneous when it found both that Kilburn elected not to return to the VA dental clinic and that Kilburn was never denied care at a VA dental clinic.

■■■ Kilburn also asserts that the district court was clearly erroneous when it concluded that he did not seek dental advice prior to his visit to Dr. Clark in 1984. Kilburn argues that it was undisputed that he had 14 fillings by 1982; that he had obviously received dental care and advice; and that he sought dental advice at the pre-irradiation dental assessment during his VA Hospital admissions and on each of his many regular visits to the VA ENT clinic, where he routinely complained of dental problems. First, Kilburn incorrectly interpreted the district court's findings to apply to his entire dental history. What Kilburn did before he was diagnosed with cancer is immaterial. Rather, the district court observed that Kilburn failed to seek

any dental care from 1983 to 1984, when he saw Dr. Clark. Kilburn presented no evidence that disputes this finding. While he may have complained of dental problems to the VA doctors at the ENT clinic, he never saw fit to schedule an appointment with either a private dentist or a VA dentist during this period. Thus, the district court's finding is not clearly erroneous.

■■■ Kilburn argues that the district court was clearly erroneous when it found that Kilburn was "at all times" eligible to receive VA dental treatment under a VA "continuation of inpatient care" program. Kilburn argues that the continuation of inpatient care program was established by Congress in 1985 and, thus, until that time, it was unavailable to him. For support, Kilburn cites testimony by Dr. Ownby. While the plaintiff correctly identified that Dr. Ownby testified that the program came into formal existence in 1985, Dr. Ownby also testified that, prior to the official enactment of the continuation program, the VA system had an informal recall or continuation program in place. Dr. Ownby testified that, "[i]f you started in the hospital and were treated in the VA system and went out the door in the VA system initially, you could go [for continued care] as long as your doctor felt it was indicated." Dr. Dukes, head of the VA dental clinic at Louisville, and Knable both testified as to the availability of continuation care. Because of the testimony regarding the existence of the continuation care program prior to 1985, the district court was not clearly erroneous in its determination that Kilburn was eligible for continuation care.

■■■ Kilburn also quibbles with the district court's finding that his lowest recorded weight was 141½ pounds and argues that it was really 115 pounds. The district court found that Kilburn's greatest rate of weight-loss occurred with the onset of cancer, rather than the loss of his mandible. Even if the district court were erroneous in its finding that Kilburn's lowest weight was 141½ pounds, it would not change the outcome of this case. Kilburn asserts that the removal of his mandible set the stage for "his life-threatening inability to intake

nutrition." Because we do not find that the medical and dental care Kilburn received from the VA necessitated the removal of his mandible, his inability to intake nutrition after its removal is irrelevant. This outcome might have been different if Kilburn had shown that once osteoradionecrosis was discovered and had progressed the removal of his mandible was not the appropriate remedy or treatment.

■■■ Kilburn also challenges the district court's finding that his continued smoking, despite many admonitions against doing so, resulted in the loss of his mandible. At least two witnesses testified that the beneficial effects of the hyperbaric oxygen therapy that Kilburn received would be significantly undermined by smoking. According to Dr. Mainous, who testified at trial, the purpose of hyperbaric oxygen treatments is to revascularize and increase the blood supply in the affected area. Smoking thwarts these beneficial effects. Nicotine and carbon monoxide are by-products of smoking. Nicotine is a vasoconstrictor and carbon monoxide reduces the amount of oxygen the blood carries. Because expert testimony supported the finding that Kilburn's smoking at least contributed to the need to remove his mandible, this finding is not clearly erroneous.

Finally, Kilburn challenges the district court's finding that the x-ray taken during his pre-irradiation assessment was recycled according to VA regulations. Even if this finding were clearly erroneous, in light of the availability of the Clark x-ray, this finding is immaterial to the outcome of this case.

## VI.

Kilburn also challenges the legal standards employed by the district judge. In particular, Kilburn argues that the district court improperly applied the doctrines of contributory negligence and assumption of the risk in contravention of Kentucky state law. Kilburn asserts that, although the district court correctly noted that Kentucky is a comparative negligence state, the court "eschewed a comparative negligence analysis in favor of a finding that Mr. Kilburn's

contribution to the harm was a bar to recovery." We disagree. Put simply, the district court found that the VA did not treat Kilburn negligently. Thus, because it was not negligent, the VA was not liable to Kilburn.

■■ Kilburn asserts that the district court appears to have improperly shifted to Mr. Kilburn the burden of proving that the information on the missing VA dental index card would have been beneficial to him. Even if the index card supported Kilburn's argument that he was never sent notices for follow-up care from the VA dental clinic, it would not alter the outcome of this case. Kilburn was treated at the VA dental clinic on several occasions, and those who treated him testified that they informed him of the necessity of regular check ups and follow-up care to obtain additional fluoride treatments. Thus, the alleged failure of the VA to send Kilburn post cards reminding him to come in for follow-up treatment is countered by the testimony of individuals who counseled Kilburn directly on the necessity for follow-up care. Because the availability of the index card would not have changed the outcome, in light of the substantial evidence demonstrating that Kilburn was instructed to receive follow-up care, any error was harmless.

■■ Kilburn also challenges the district court's application of *Sias v. Secretary of Health & Human Servs.*, 861 F.2d 475 (6th Cir.1988). Kilburn asserts that because, unlike the plaintiff in *Sias*, the credibility of his claim of injury is not at issue, the application of *Sias* to bar recovery was prejudicial error. We disagree. The district court noted that "Kilburn's willful acts and contravention of medical and dental advice constitute a *further* basis for denial to him of any recovery against the Veterans Administration." (Emphasis added). Even if the district court incorrectly interpreted *Sias*, because the court's primary finding was that the VA medical and dental personnel were not negligent in their treatment of Kilburn, the plaintiff's contribution to and aggravation of his mal-

adies is irrelevant. The plaintiff brought a claim asserting that the VA personnel were negligent. The district court found that they were not. Thus, regardless of the plaintiff's role, he may not recover.

Because we do not find that the district court erred, Kilburn's final argument, that he was denied due process by the district court, is without merit.

AFFIRMED.