NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0662n.06

No. 08-5764

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

Sep 25, 2009

LEONARD GREEN, Clerk

MACTEC, INC., )
)
    *Plaintiff-Appellee*, )
)
           v. )
)
BECHTEL JACOBS COMPANY, LLC, )
)
    *Defendant-Appellant*. )

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF TENNESSEE

**O P I N I O N**

BEFORE: NORRIS, and COLE, Circuit Judges; and ADAMS, District Judge.[*]

    **COLE, Circuit Judge.** Defendant-Appellant Bechtel Jacobs Company, LLC ("BJC") appeals from the district court's judgment following an eight-day bench trial. The district court awarded Plaintiff-Appellee MACTEC, Inc. ("MACTEC") $9,844,319.82, plus attorney fees and interest, on several of its claims and denied all of BJC's counterclaims. BJC asserts that the district court erred by: (1) finding unreliable the testimony of BJC's primary fact witness; (2) accepting and adopting MACTEC's expert testimony on its two largest claims; (3) rejecting BJC's counterclaims; and (4) finding for MACTEC on its third-largest claim. BJC argues that the foregoing errors warrant reversal of the judgment and remand to the district court for a new trial. For the following reasons, we **AFFIRM**.

---

    [*]The Honorable John R. Adams, United States District Judge for the Northern District of Ohio, sitting by designation.

# I. BACKGROUND

## A.     Factual Background

### 1.     The DOE/BJC Contract and the BJC/MACTEC Subcontract

#### a.     Background

The parties' dispute arises from alleged breaches of a subcontract for the design and construction of a hydraulic isolation system for Solid Waste Storage Area 4 ("SWSA 4"), located in the Melton Valley area of the United States Department of Energy's ("DOE") Oak Ridge Reservation ("ORR"). SWSA 4 contains buried radioactive waste, and in December 1997, the DOE awarded BJC a five-year, $2.5 billion Management and Integration Contract to engineer and oversee a transition toward a closure of the ORR. On April 1, 1998, after a three-month phase-in period, BJC assumed responsibility for the ORR work. BJC subsequently awarded MACTEC a lump-sum, fixed-price, $12,231,283.00 Subcontract to design and construct a remediation system in accordance with the terms of the *Record of Decision for Interim Actions for the Melton Valley Watershed* ("ROD") that was previously agreed upon and drafted by the DOE, the Environmental Protection Agency ("EPA"), and the Tennessee Department of Environment and Conservation ("TDEC").

The ROD and the Subcontract required that the remediation system include the following components: (1) an upgradient divergent trench; (2) a landfill cap consisting of six inches of vent-layer stone, contour fill, three layers of geosynthetics, a protective cover, and six inches of topsoil; (3) a collection of underdrain along the alignment of the SWSA 4 tributary at the southern edge of SWSA 4; (4) a downgradient trench ("DGT"); and (5) a wastewater treatment facility that would remove contaminated water from the DGT and deposit treated water into an adjacent Intermediate Holding Pond ("IHP"). The ROD and Subcontract also required MACTEC to remove contaminated soil and vegetation from the IHP and perform wetlands restoration.

The Subcontract required MACTEC to provide BJC with a Baseline schedule (the "Baseline") for its approval before starting work. In the context of complex construction contracts, a baseline schedule typically details the following elements: (1) the identification of the specific construction activities to be performed to complete the project; (2) cost and time estimates of each activity; (3) a determination of sequential relationships to establish the precise sequence of performance of all activities in the most efficient manner; and (4) a presentation of the sequenced activities in the form of a "network" diagram. *See* Philip L. Bruner & Patrick L. O'Connor, Jr., 5 *Bruner & O'Connor Construction Law* § 15:8 (May 2009).

The Baseline directed MACTEC to complete all field work on or before November 14, 2003. However, following the tragic events of September 11, 2001, BJC issued a suspension-of-work order, which prevented MACTEC from getting the Project underway from November 8, 2001 until October 1, 2002. Once the suspension-of-work order was lifted, the parties drafted Subcontract Modification 12 ("Modification 12"), formally extending the field-work completion date to March 31, 2004. The parties also agreed to a revised baseline schedule (the "Second Baseline"), which directed MACTEC to complete all work on the Project by October 28, 2004. The Second Baseline was essentially a revised time-line for interrupted schedule elements in-process at the time of the work suspension that extended the Project-completion date by six months.

### b. Scheduling requirements

The Subcontract required MACTEC to provide BJC with regular schedule updates using the Critical Path Method ("CPM") to "show each essential activity in sequence to meet the Subcontract Schedule Milestones . . . ." (Subcontract SC-3, BJC App. Vol 1, 26.) The CPM method has been described as follows:

Essentially, the [CPM] is an efficient way of organizing and scheduling a complex project which consists of numerous interrelated separate small projects. Each subproject is identified and classified as to the duration and precedence of the work. (*E.g.*, one could not carpet an area until the flooring is down and the flooring cannot be completed until the underlying electrical and telephone conduits are installed.) The data is then analyzed, usually by a computer, to determine the most efficient schedule for the entire project. However, some items of work are given no leeway and must be performed on schedule; otherwise, the entire project will be delayed. These latter items of work are on the "critical path." A delay, or acceleration, of work along the critical path will affect the entire project.

*Haney v. United States*, 676 F.2d 584, 596 (Ct. Cl. 1982). The "critical path" has been defined as "the longest path in the schedule on which any delay or disruption . . . would cause a day-for-day delay to the project itself . . . . Those activities must be performed as they are scheduled and timely in order for the project to finish on time . . . ." *Wilner v. United States*, 23 Cl. Ct. 24, 245 (Cl. Ct. 1991). Because a project's critical path continues to evolve even after work has commenced, "in order to grasp accurately the delays that a project takes on, the critical path should be updated regularly." *Wilner*, 23 Cl. Ct. at 245 (citing *Fortec Constructors v. United States*, 8 Cl. Ct. 490, 505 (Cl. Ct. 1985)).

The Subcontract set forth MACTEC's obligations to furnish BJC with weekly updates, as follows:

SUBCONTRACTOR shall promptly inform CONTRACTOR of any proposed change in the baseline schedule and shall furnish CONTRACTOR with a revised schedule network and narrative within seven (7) days after notification to the CONTRACTOR of the requested change. The CONTRACTOR shall approve any changes prior to the revised schedule being used as the [Second Baseline]. The schedule and narrative shall be kept up to date, taking into account the actual work progress and shall be updated weekly. The revised schedule and narrative shall, as determined by the CONTRACTOR, be sufficient to meet the requirements for monitoring progress.

During the performance of the Work, SUBCONTRACTOR shall submit to CONTRACTOR periodic reports on the actual progress. Such progress reports shall include the following:
- Weekly: A copy of the Subcontract Schedule network reflecting actual progress to date for the activities shown in the approved baseline schedule.

- Weekly: A four-week look-ahead of personnel forecast by craft.

- Weekly: A rolling four-week schedule showing one week actual progress and a three-week look-ahead forecast. Variation from the approved baseline schedule shall be noted and rationalized.

- Weekly: A report of quantities of Work performed versus total quantities on active items of the work.

- Daily: A daily report listing all personnel by craft, hours and work assignment, facilities and equipment used, materials installed, lower tier subcontractors utilized in the work, a narrative of work performed and any ES&H concerns/incidents encountered that day . . . .

(Subcontract SC-3, BJC App. Vol. 1, 27.)

There is no dispute that MACTEC submitted the required updated CPM schedules to BJC. However, beginning in September 2003, MACTEC started to submit CPM schedules that included a Project end-date beyond that agreed upon in the Second Baseline. BJC rejected all of MACTEC's post-September 2003 CPM schedules and continually informed MACTEC that it would consider MACTEC to have breached the Subcontract if the Project was not put back on schedule. The Project proceeded with this contentious back-and-forth between the parties—MACTEC timely submitted a required weekly CPM schedule and requested a time extension on the Project, and BJC rejected the schedule and the request.

In the context of construction projects, "acceleration" refers to a situation where a contractor must complete greater work than originally planned within the scheduled project constraints. *See, e.g., Ace Constructors, Inc. v. United States*, 70 Fed. Cl. 253, 281 (Fed. Cl. 2006). Acceleration also frequently occurs in the form of "constructive acceleration"—where a contractee orders the contractor to meet the current schedule in the face of excusable delays. *See id*. at 280 (setting forth the requirements for constructive acceleration). By directing MACTEC to adhere to the timeline set forth

in the Second Baseline without even considering whether an extension was warranted, BJC placed MACTEC in a de facto condition of accelerated performance, requiring MACTEC to make additional hires, pay its employees overtime, and schedule extra shifts in order to perform the work in accordance with the Second Baseline.

2.      *Changes to the Subcontract*

a.      *MACTEC's Requests for Equitable Adjustment*

An "equitable adjustment" is a mechanism used in fixed-price construction contracts intended to fairly compensate a contractor for a contract modification resulting from changes in circumstances occurring after the execution of the original contract. *See* Philip L. Bruner & Patrick L. O'Connor, Jr., 6 *Bruner & O'Connor Construction Law* § 19:50 (May 2009). An equitable adjustment can be an extension in the time a contractor has to complete a contract or additional monetary compensation for a change in the work required. *See id*. Courts have held that a contractor seeking an equitable adjustment must prove three elements—liability, causation, and resultant injury. Namely, the contractor must demonstrate that the other party was responsible for causing it to incur the additional costs that changed the course of the contract. *See Blinderman Constr. Co., Inc. v. United States*, 39 Fed. Cl. 529, 538 (Fed. Cl. 1997).

Subsection GC-20 of the Subcontract, "Equitable Adjustment," sets forth the formal requirements for MACTEC's submission of a proposed Request for Equitable Adjustment ("REA") to BJC, directing MACTEC to provide a firm fixed-price proposal for any proposed adjustment in price or schedule and a narrative addressing the details of that proposal. Over the course of the Project, MACTEC submitted more than seventy REAs to BJC. The parties successfully settled many of MACTEC's REAs prior to trial, although they were not timely addressed and resolved. Toward

the conclusion of the Project, BJC ceased negotiating with MACTEC over its REAs and other claims for additional compensation.

### b. Subcontract modifications

The parties also formally modified the Subcontract, although only Subcontract Modifications 5, 10, and 32 are relevant to BJC's appeal. On August 1, 2001, the parties entered into Subcontract Modification 5 ("Modification 5"), effective as of June 28, 2001. On January 19, 2001, MACTEC submitted an REA for gross inaccuracies in BJC's topographical survey data, and Modification 5 compensated MACTEC an additional $100,248.03 for incorporating its own corrected topographic information into the design. The parties finalized Subcontract Modification 10 ("Modification 10") on March 28, 2002, through which they agreed to increase MACTEC's Subcontract price by $909,708.00 for new Pay Item 2.02(o), "Contaminated Vegetation Grinding," and revised MACTEC's "Scope of Work" accordingly. As revised, the Subcontract specifically required that "[t]rees, brush, and vegetation shall be chipped or ground and mixed with fill material under the cap[, on top of the original soil,] such that it will not cause detrimental subsidence." (Modification 10, BJC Exs. Vol. 1, 54.) Finally, Subcontract Modification 32 ("Modification 32"), which the parties entered into on February 11, 2005, compensated MACTEC an additional $856,000.00 for costs associated with BJC's requirement that MACTEC accelerate the Project and its repeated refusal to grant MACTEC any of its requested time extensions. Modification 32 also provided MACTEC with a schedule extension, giving it until September 8, 2004 to complete all field work, and until March 10, 2005 to finish the overall Project.

### 3. Events relating to the completion of the Project

After the 2001 suspension-of-work order was lifted, MACTEC encountered several obstacles to completing the work on schedule. First, 2003 and 2004 were both unseasonably wet, and MACTEC was delayed by the unusually rainy weather. From November 2003 through March 2005, MACTEC requested fifty-two separate weather-related time extensions and applied for corresponding schedule updates from BJC, all of which BJC rejected. BJC also ignored MACTEC's assertions that given the setbacks the Project had already experienced, it would be fruitless to try to design a recovery plan to try to get the Project back on schedule. On January 14, 2004, the DOE gave BJC a sixty-five-day extension for the unusually severe weather conditions that occurred in 2003, but although MACTEC advised BJC of continuing problems caused by the wet weather on-site, BJC gave MACTEC no such extension.

On both December 17, 2003 and August 19, 2004, BJC wrote MACTEC letters specifically threatening to terminate the Subcontract. Notably, the fact that the Project was commissioned by the DOE made such a threat more serious because in the context of federal government contracts, a terminated contractor can lose its bonding capacity and will likely be unable to work on future federal government-run projects. BJC demanded that MACTEC achieve the un-extended completion dates specified in the Second Baseline, and MACTEC attempted to do so by re-sequencing its work. MACTEC asserts that if BJC had granted its requests for an extension, it would have waited until the work-site dried before proceeding and would not have been forced to make significant expenditures for extra materials and added labor.

MACTEC also dealt with Radiation Control ("RADCON") inspectors' unanticipated discovery of a number of radioactivity "hot spots" on the work-site following the completion of previous remediation efforts. When these hot spots were discovered, BJC directed MACTEC to cap the affected area. Thus, MACTEC had to increase the total amount of contour fill used beneath the

cap by approximately 109,786 cubic yards. As a result, the SWSA 4 cap grew approximately 17 acres—from the 94 acres set forth in BJC's original bid design, to 111 acres total.

MACTEC's work was also affected significantly by BJC's decision to "de-scope" a number of elements of the original design from the Subcontract. BJC deleted certain non-critical items, but its de-scoping of the wastewater treatment facility ("WTF") is crucial to MACTEC's claim. Specifically, the original Subcontract required MACTEC to install a DGT at the SWSA 4 cap boundary in order to collect contaminated water from the capped area to prevent it from being discharged into the local surface water, and allowed MACTEC two years to monitor the DGT's performance. However, during the performance of the Project, BJC de-scoped the WTF, the purpose of which was to "take water that was collected from the [DGT, and] treat it" to achieve the "standards required for discharge to White Oak Creek." (Tr. Vol. 3, 20:21-23.) By de-scoping the WTF, BJC would have to pump the DGT-water off-site to be treated at a centralized water treatment facility. MACTEC claims that the WTF was a crucial element of the DGT and asserts that without it, the DGT could not be fully operational. MACTEC asserts that BJC's decision to de-scope this sub-element of the Subcontract denied it the means to begin operating the Project's interrelated elements, thereby affecting its ability to adhere to the agreed-upon Second Baseline. MACTEC also argues that BJC did not tell MACTEC that it planned to de-scope the WTF until January 12, 2005, though it knew of the change in the spring of 2003.

In early 2005, following the completion of MACTEC's work on the DGT, BJC conducted a January 2005 pump test to determine whether the DGT was constructed in accordance with the Subcontract. At a meeting with regulators on June 9, 2005, BJC announced that the DGT was "defective" because the pump test had revealed that it leaked water and allowed in too much silt, causing blockages in the DGT. BJC only informed MACTEC about the planned June 9 meeting one

day beforehand. Despite MACTEC's ardent requests, it neither allowed MACTEC to attend the meeting nor granted its suggestion to delay the meeting to allow MACTEC to demonstrate to BJC that the DGT was *not* defective. Although the contract entitled MACTEC to turn on and operate the System (including the WTF) through a five-month wet season in order to pump water from the DGT, BJC deprived MACTEC of this entitlement by de-scoping the operation of the WTF from the Subcontract based on its internal decision to treat all of the SWSA 4 collected water at a centralized WTF constructed by another subcontractor. After completing a substantial second round of tests, many of which were "inconclusive," BJC added several more pumps and sumps to the DGT and upgraded the electrical system and conveyance piping between the sumps. However, none of these changes to the structure affected the flow of the water being generated and treated, and BJC never altered the overall physical structure of the MACTEC DGT.

Ultimately, BJC's corrective measures successfully removed excess silt material from the DGT sumps, but not from the DGT itself. Following BJC's corrective measures, the DGT was fully operational, and regulators approved it for use three months later. At that point, BJC discovered possible leaks in the DGT caused by external sources and conducted ten off-site leak tests, which were directed at potential water sources outside of the capped area.

BJC earned one hundred percent of all of the Performance-Based Incentives associated with MACTEC's Project, a total of $2,276,400.00. MACTEC originally bid $12,231,283.00 on the Project, and after settling certain REAs and making various Modifications, BJC paid MACTEC $13,888,112.00. But BJC refused to pay MACTEC for its earned Subcontract balance, retainage, REAs, and various extra work items because it claimed that the DGT was defective, and that MACTEC never operated the WTF during a wet season as directed by the Subcontract. Given

MACTEC's $31,991,000.00 in out-of-pocket costs incurred to perform the Subcontract in accordance the accelerated schedule, MACTEC asserts that it lost $18 million completing the Project.

**B.       Procedural Background**

*1.       MACTEC's suit*

On July 6, 2005, MACTEC sued BJC in the United States District Court for the Eastern District of Tennessee, seeking $2,714,086.00 for the unpaid Subcontract balance.   MACTEC also sought more than $5 million in additional damages arising from seventeen unresolved REAs and three general claims.  Generally, MACTEC's outstanding REAs and claims for additional compensation consist of: constructive acceleration costs; damages for BJC-directed changes to MACTEC's planned Project sequence; and costs associated with the differing site conditions encountered by MACTEC. On April 18, 2007, MACTEC amended its complaint to include the following five claims: (1) breach of contract; (2) quantum meruit; (3) unjust enrichment; (4) breach of implied covenant of good fath and fair dealing; and (5) violation of the Tennessee Prompt Pay Act of 1991, Tennessee Code Annotated §§ 66-34-101, *et seq*. ("Prompt Pay Act").  On November 29, 2006, BJC asserted nine counterclaims, requesting $3,508,391.00 in damages allegedly incurred to repair and finish MACTEC's defective and incomplete work.

*2.       Bench trial*

The district court conducted an eight-day bench trial occurring from August 27 to September 6, 2007.  During the trial, MACTEC called six fact witnesses and two expert witnesses: (1) Billy Reid, Vice President of MACTEC Development Corporation, a subsidiary of MACTEC, who worked with MACTEC's designers in preparing MACTEC's bid and estimate for the Project; (2) Matt Foster, the Project Control Analyst, Project Manager, and Scheduler, who visited the Project site several times a week until October 2003, when, at BJC's request, he was replaced; (3) Mark Cade,

MACTEC's Field Engineer primarily responsible for handling the Project's field changes, who was physically located on-site; (4) Jim Bowman, MACTEC's Project Superintendent, who visited the Project site daily; (5) Curtis Lowther, an accountant with over ten years of accounting experience in the construction industry and knowledge of MACTEC's accounting system; (6) Ron Lewis, a MACTEC engineer who prepared the groundwater model for the Project; (7) Dr. Peter Shanahan, an expert in groundwater hydrology and environmental engineering; and (8) A. Joseph DuPree, a cost and scheduling expert.

BJC called four fact witnesses and one expert witness: (1) Robert Spurling, a former BJC employee who was a Task Lead and Project Manager for SWSA 4; (2) Frank Cater, a BJC senior engineer, involved with the Project beginning in 2003, and Task Lead from June 2005 on; (3) Michael Sholley, a BJC engineer who became involved in the Project in August 2005; (4) Mary Beth Blair, BJC's planning and Budget Manager; and (5) George Pinder, a civil and environmental engineer and a director of the Research Center for Groundwater Remediation Designs.

### 3. *District court decision*

After the trial, each party submitted extensive Proposed Findings of Fact ("Findings") and Conclusions of Law ("Conclusions") for the district court's consideration. Though it had initially sought $5,044,963.00 in damages, plus attorney fees and interest, following the bench trial, MACTEC amended its requested damages to a total of $12,392,866.80.

### a. *MACTEC's claims*

On May 19, 2008, the district court issued a judgment in favor of MACTEC and awarded $9,844,319.82 in damages, plus attorney fees and interest. MACTEC recovered on all but two of its claims—REA 54, the "haul road claim," and REA 55, the "CLA claim." The district court concluded

that: (1) the Subcontract was a "performance contract," meaning that MACTEC was tasked with selecting the materials, means, and methods for accomplishing the agreed-upon objective; (2) BJC materially breached the Subcontract by continually interfering with MACTEC's ability to perform and de-scoping material elements of the Project; (3) BJC breached the covenant of good faith and fair dealing by refusing to grant MACTEC's requests for weather-related time extensions, especially when BJC itself was awarded such extensions by the DOE and constructively accelerated the Project by forcing MACTEC to stay on schedule despite the substantial number of excusable delays; (4) BJC acted in bad faith; (5) alternatively, MACTEC was entitled to recover for unjust enrichment; (6) alternatively, MACTEC was entitled to recover in quantum meruit; and (7) MACTEC was entitled to recover its costs and attorney fees under Tennessee's Prompt Payment Act. Importantly, in concluding that BJC did not act in good faith, the court specifically determined that:

> BJC did not deal in good faith, with common fairness, or common equity by, among other things (1) repeatedly threatening MACTEC with termination when there was no basis to do so; (2) failing to grant legitimate time extensions for unusually severe weather while BJC knew that MACTEC was suffering from such delays and after having itself received the same relief from DOE; (3) declaring to the regulators that MACTEC's DGT was defective when in fact it was not, and doing so without seeking or incorporating MACTEC's input; (4) refusing to permit MACTEC to develop the sumps in the DGT so that it could operate the WTF, and instead demanding a "silt free" DGT[,] which it acknowledged was technically impossible; (5) declining MACTEC's request to participate in the June 9, 2005 presentation to the regulators regarding the DGT; (6) forcing MACTEC to perform a completely new topographical survey without a time extension while holding MACTEC to the RDR milestone date; (7) holding MACTEC to unreasonable schedule deadlines, thereby resulting in significant increased costs to MACTEC, so that, in part, BJC could obtain its own performance based incentives that totaled in excess of $2,250,000; and (8) informing MACTEC for the first time that BJC elected to delete the WTF on January 12, 2005, although BJC had internally concluded to delete the WTF as early as April 2003.

(ROA Vol. 1, 1489-90, ¶ 619.)

### b.    BJC's counterclaims

The district court also concluded that BJC could not recover on any of its counterclaims because: (1) BJC failed to prove that its requested damages resulted from any breach of the Subcontract attributable to MACTEC; (2) BJC improperly took control over the Project; (3) BJC de-scoped the System's WTF, making MACTEC's Subcontract performance impossible; (4) BJC unilaterally changed the Subcontract's testing procedures and imposed a more stringent performance requirement than that which was set forth in the Subcontract; (5) BJC unjustifiably spent over $2.7 million "experimenting" with the system—*i.e.*, conducting pump tests and leak tests—rather than allowing MACTEC time to "tinker" with it, as directed by the Subcontract; (6) MACTEC's claim for Subcontract balance and retainage included a credit for some of BJC's claims; and (7) BJC failed to establish the value of its backcharges. The district court also rejected BJC's post-trial request that MACTEC be investigated by the DOE's Office of Inspector General or by the United States Department of Justice for an alleged violation of the False Claims Act, noting that the claim was "another example of [BJC's] bad faith." (ROA Vol. 1, 1504, ¶ 664.)

## C.     BJC's appeal

BJC appealed, claiming that the district court erred by: (1) unfairly adopting nearly all of MACTEC's proposed Findings and Conclusions to conclude generically that BJC's principal fact witness lacked the requisite knowledge to refute MACTEC's witnesses's accounts; (2) accepting the flawed analysis by and conclusions of MACTEC's damages expert; and (3) failing to address substantively seven of BJC's nine counterclaims.

## II. STANDARD OF REVIEW

On appeal from a bench trial, we review the district court's findings of fact for clear error and its conclusions of law de novo. *Pressman v. Franklin Nat'l Bank*, 384 F.3d 182, 185 (6th Cir. 2004). Further, we review mixed questions of law and fact de novo. *See Paul Revere Life Ins. Co.*

*v. Brock*, 28 F.3d 551, 553 (6th Cir. 1994). "A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Coy/Superior Team v. BNFL, Inc.*, 174 F. App'x 901, 905 (6th Cir. 2006) (internal quotation marks and citations omitted).

When the district court's findings rest on credibility determinations, Federal Rule of Civil Procedure 52 demands even greater deference to the district court. *See Coy/Superior Team*, 174 F. App'x at 905-06 (citing *Anderson*, 470 U.S. at 575; *Hamilton*, 243 F.3d at 997-98; *In re Cleveland Tankers, Inc.*, 67 F.3d 1200, 1205 (6th Cir.1995)). However, we need not accept factual findings that result in a misapplication of governing law or otherwise do not permit meaningful appellate review. *See Pullman-Standard v. Swint*, 456 U.S. 273, 292 (1985). Nor must we accept findings that are "utterly deficient in other ways." *United States v. Microsoft Corp.*, 253 F.3d 34, 118 (D.C. Cir. 2001). "In such cases, we vacate and remand for further factfinding." *Id.* (citing 9 *Moore's Fed. Prac.* § 521.12[1] (Matthew Bender 3d ed. 2000); 9A Charles Wright & Arthur R. Miller, *Fed. Prac. & Pro.* § 2577, at 514-22 (2d ed. 1995)).

Here, we construe the parties' claims in accordance with the terms of the Subcontract, which expressly provide that in the event of a dispute, the Subcontract must be interpreted "in accordance with the federal law of government contracts including decisions enunciated by federal judicial bodies, boards of contract appeal, and quasi-judicial agencies of the federal Government." (BJC App. Vol. 1, 18-19.) The Subcontract further states that, "[t]o the extent that the federal law of government contracts is not dispositive, the laws of the state in which the Work is primarily performed[, in this case, Tennessee,] shall apply." (BJC App. Vol. 1, 19.)

## III. ANALYSIS

### A. BJC has forfeited claims not raised on direct appeal

As a threshold matter, we decline to consider any claims that BJC did not explicitly raise on appeal. Certain claims that the district court resolved, which BJC did not address, include: Subcontract Balance ($2,726,398.20), SCN 41, REAs 50-57, 59, 60, 63-66, 71, and 73. BJC also did not address the district court's denial of its requested backcharges for experimenting with the DGT pumping system ($2,708,080.00), and conducting leak tests and other efforts aimed at counteracting the purported water infiltration into the DGT ($314,831.00), or its grant of MACTEC's counts for unjust enrichment, quantum meruit, attorney fees, bad faith, and the violation of the Tennessee Prompt Pay Act.

Federal Rule of Appellate Procedure 28(a) requires that an appellant's brief include a "'statement of the issues presented for review,' and '[a]n argument' on each issue presented." *Bickel v. Korean Air Lines Co., Ltd.*, 96 F.3d 151, 153 (6th Cir. 1996) (citing Fed. R. App. P. 28(a)). "We normally decline to consider issues not raised in the appellant's opening brief." *Priddy v. Edelman*, 883 F.2d 438, 447 (6th Cir. 1989) (citing *Wright v. Holbrook*, 794 F.2d 1152, 1157 (6th Cir. 1986)); *see also McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (citing *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293-94 (1st Cir.1995) (citation omitted)). Under the circumstances of this case, we see no reason to depart from that policy.

Therefore, we can decide the instant appeal by limiting our review and analysis to MACTEC's three largest claims—(1) the "contour fill" claim; (2) the "extended program costs claim"; and (3) REA 69, the "additional vent-layer stone" claim— the details of which are set forth below.

1.      *Contour fill overrun claim*

"Contour fill" consists of uncontaminated ("clean") dirt obtained from a "borrow pit" that was placed over the vent-layer stone to construct the cap. "Borrow pit" is a term used in construction and civil engineering to describe an area where material (usually soil, gravel or sand) is dug for use at another location. The term is literal—meaning a pit from where material is borrowed. MACTEC sought to recover costs associated with amounts of additional contour fill that it did not anticipate in its bid, explaining that BJC provided MACTEC with inaccurate topographical surveys in 2001, and that it was forced to spend significant unanticipated resources, time, and money to deal with the impacts caused by numerous unanticipated radiation hot spots on the growing cap. MACTEC sought $2,736,964.00 for the costs incurred from the added contour fill, and the district court awarded it $3,010,661.48.

### 2. Extended program costs claim

MACTEC also sought to recover for certain additional costs incurred following the agreed-upon Project completion date—termed "extended program costs." MACTEC asserted that BJC's accelerated schedule failed to account for the unexpected impacts that prevented MACTEC from performing its work in accordance with both the Baseline and the Second Baseline. MACTEC sought $1,343,319.86 in damages on this claim, and the district court awarded it $916,300.00.

### 3. Additional vent-layer stone claim (REA 69)

The "vent layer" is the first layer placed on the pre-existing ground surface (or in some locations, on top of other contaminated materials placed by MACTEC that were secured underneath the cap), consisting of a minimum six-inch thick layer of stone providing a continuous path for any gases emitted from the underlying burial ground to escape without damaging the cap. REA 69, which was first submitted by MACTEC in its July 2007 Addendum to MACTEC's original Damages Assessment Report, sought $920,500.00 for: (1) the cost of the additional vent-layer stone required

by the site conditions MACTEC encountered when BJC refused to grant its requests for time extensions to accommodate the unusually wet 2003 and 2004 weather ($569,603.00 for 56,828 additional tons of stone—160% more than was estimated in MACTEC's bid); and (2) the cost of labor to place the additional vent-layer stone (250 hours each for twelve field personnel and placement equipment, plus up to 125 hours each for MACTEC management personnel). The district court awarded MACTEC $851,631.88 for the additional vent-layer stone claim.

**B.    The district court's adoption of many of MACTEC's proposed Findings and Conclusions does not warrant reversal**

BJC contends that the district court's decision should be reversed and the case remanded because the district court focused solely on MACTEC's "side of the story." (Brief of Appellant BJC ("BJC Br.") 15.) BJC also asserts that this Court should adopt a heightened standard of review in considering those Findings and Conclusions in the district court's decision that were adopted from MACTEC's proposed Findings and Conclusions. MACTEC counters that the court did not engage in a "wholesale or verbatim adoption of MACTEC's proposed findings," and that regardless, the decision may only be reversed for clear error, which did not occur. (Br. of Appellee MACTEC, Inc. ("MACTEC Br.") 32-34.)

We have expressly disapproved of a court's verbatim adoption of findings of fact submitted by counsel. *Kilburn v. United States*, 938 F.2d 666, 672 (6th Cir. 1991) ("Appellate courts generally frown on the wholesale adoption of findings of fact and conclusions of law submitted by one of the parties."). However, in so doing, we have clarified that:

> [t]he fact that proposed findings of fact, prepared and submitted by the successful attorneys, have been adopted by the trial court does not detract from their legal force or effect. When adopted, such findings become the findings of the court, and are entitled to the same respect as if the judge . . . had drafted them.

*Kilburn*, 938 F.2d at 672 (citing *O'Leary v. Liggett Drug Co.*, 150 F.2d 656, 667 (6th Cir. 1945)). Here, it is undisputed that the district court's decision incorporates many of MACTEC's Findings and Conclusions. Nevertheless, 335 of the district court's 515 Findings cite witness testimony in support of the Finding, and 235 of those citations are to BJC witnesses. Morever, the district court makes fourteen Findings and eleven Conclusions addressing directly various arguments by BJC. Thus, although the district court adopted more of MACTEC's proposed Findings and Conclusions than BJC's, BJC has pointed to nothing indicating that the district court neglected to carefully consider BJC's position in making its painstakingly thorough decision, and its Findings are entitled to deference. *Woolridge v. Marlene Indus. Corp.*, 875 F.2d 540, 544 (6th Cir. 1989) (finding support for special master's verbatim adoption of a defendant's proposed Findings and Conclusions because "all parties had equal opportunity to submit proposed reports for the special master's consideration and did so").

Additionally, we reject BJC's argument that even if the district court's adoption of the majority of MACTEC's Findings and Conclusions does not compel us to remand, we should at least scrutinize the decision more closely than we would had the district court adopted equally the proposed Findings and Conclusions of both parties. We have previously held that BJC's proposed "close scrutiny" is not warranted. *See Kilburn*, 938 F.2d at 672 ("[Plaintiff] next argues that, because the district court adopted the defendant's findings of fact and conclusions of law, we should more closely scrutinize its factual findings. We disagree."). Thus, as is the case in our review of all bench trials, we review the district court's findings of fact for clear error and its conclusions of law de novo. *See Pressman*, 384 F.3d at 185.

**C.    The district court did not err in determining that BJC's key fact witness was less credible than MACTEC's fact witnesses, and isolated misstatements in its Findings do not warrant reversal**

*1.*     *The district court did not err in determining that Robert Spurling did not have adequate first-hand knowledge of the Project to be deemed credible when compared with MACTEC's fact witnesses*

As noted above, BJC proffered four fact witnesses at trial—Robert Spurling, Frank Cater, Michael Sholley, and Mary Beth Blair. Spurling was BJC's principal fact witness, and he testified directly as to fifteen of MACTEC's nineteen REA claims and five of BJC's counterclaims. In fact, he was the sole witness for many of these claims. Spurling testified that he joined BJC in April 1998, after BJC took over the contract for the environmental cleanup work at the ORR. From 1998 to December 2000, Spurling was the Project Manager on two of BJC's other Tennessee-area remediation projects, at which point he was put on the SWSA 4 Project as the Subcontract Technical Representative ("STR") through design, and as the Task Lead (effectively a "Deputy Project Manager"). (Tr. Vol. 9, 133:8-15.) He explained that he was the STR only during the design phase, and that in November 2003, he became Task Lead for both the SWSA 4 Project and the balance of the Melton Valley cap work. Spurling also testified that after becoming Task Lead, he participated in the Project's monthly "Core Team Meetings," which included representatives from the DOE, EPA, and TDEC, as well as the BJC project managers from each of the units addressed under the ROD. Spurling explained that as of May 2005, he "went to the site daily, maybe a couple of times a day, to check in with [BJC] folks," especially when BJC was running a pump test to evaluate the effectiveness of the MACTEC-designed DGT. (Tr. Vol. 9, 173: 22-25.) Further, he testified that during the summer of 2004, he traveled on the Project's haul road "many times — daily." (Tr. Vol. 10, 49:6-19.)

The district court found Spurling less credible than MACTEC's fact witnesses, noting that Spurling was "admittedly only involved, on a more regular basis, with the completion of the SWSA 4 work." (RPA Vol. 1, 72 ¶ 322.) The court reasoned:

318.    . . . BJC cites to only one instance that is based on Robert Spurling's personal experience.  This testimony was based on traveling through the particular area only "three, maybe four times during the two-month period affected."

319.    Spurling was initially the [STR] for the design phase of SWSA 4.  In 2000, his responsibilities changed to include developing an accelerated closure plan and the related scope of work for all the other capping activities within Melton Valley.  In 2003, he became the "Task Lead" for all the projects in the entire Melton Valley site.

320.    Spurling relied upon alleged out of court statements made by BJC's SWSA 4 STRs and various regulators and DOE officials during his testimony.

321.    The court specifically asked BJC whether it was going to present a regulatory official to testify to these out of court statements.  BJC replied: "[w]e are planning to Your Honor."  They never did.

322.    BJC claims, without citing to any evidence, that Spurling was "responsible for the day-to-day operations, was at the SWSA 4 site on a daily basis, and was routinely involved in communications and discussions between BJC and MACTEC about completion of the work at SWSA 4."  Yet, the court finds that there is absolutely no evidence in the record to substantiate Spurling's involvement on the SWSA 4's day-to-day issues.  To the contrary, the evidence indicates that Spurling was heavily involved in several other Melton Valley projects while he was simultaneously overseeing work on SWSA 4.  The court further finds that Spurling was admittedly only involved, on a more regular basis, with the completion of the SWSA 4 work.  The completion of the SWSA 4 work occurred in early 2005 . . . .

325.    I find that BJC did not offer any fact witnesses that had knowledge of the Project during its performance.   BJC did not provide testimony from its superintendents, engineers, quality supervisors or STRs.  Outside of Spurling - who had limited first-hand knowledge of the Project given his involvement in several other Melton Valley projects - BJC provided the testimony of witnesses who were engaged after the construction work was completed.  BJC's fact witnesses lack the requisite knowledge to credibly refute MACTEC's witnesses' accounts of BJC's daily impacts and the damages suffered by MACTEC.

(ROA Vol. 1, 1401-1402, ¶¶ 318-22, 325) (internal citations omitted).  BJC argues that the above Findings were in error because the district court clearly neglected to acknowledge Spurling's testimony as to several specific events showing his personal involvement and credibility when compared to MACTEC's fact witnesses.  We disagree.

"When a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 676 (6th Cir. 2008); *see also Anderson*, 470 U.S. at 573-75. It is undisputed that in this case the district court oversaw lengthy and contentious litigation by the parties prior to issuing its incredibly detailed decision. In fact, before drafting the decision, the district court: accepted pre-hearing briefs from both parties; received evidence over an eight-day bench trial where he heard testimony from several witnesses on both sides of the dispute; considered testimony from designated 30(b)(6) depositions; admitted and reviewed over 1500 exhibits; received and reviewed objections from both parties regarding the proffered exhibits; received in excess of 1200 proposed Findings and Conclusions from MACTEC and BJC; and allowed the parties to supplement the record with any additional filings after the trial, which they both did.

Although in its briefs BJC correctly points out certain inconsistencies and misstatements occurring throughout the decision (some of which relate to the district court's consideration of Spurling's testimony), when placed in the context of the entire 170-page decision, we conclude that these inaccuracies were relatively minor, and did not prejudice BJC such that they would warrant reversal. *See Kotteakos v. United States*, 328 U.S. 750, 776 (1946) (noting that an error is harmless unless it is highly probable that it had a substantial and injurious effect or influence on the outcome of the trial). Moreover, to the extent that Spurling testified about statements made by regulators and failed to honor the court's request that BJC call a regulator to testify directly as to those statements, it effectively hindered itself from proffering testimony by a witness that the court would find more

credible than Spurling. Under the circumstances, the district court did not clearly err in finding that Spurling lacked personal involvement in the Project.

    2.    *Any inconsistent statements by the district court regarding Spurling were harmless error*

BJC also asserts specifically that Findings 318 and 128 were contradictory misstatements, and that the court's clear error as to these Findings "taints the entire Decision" and warrants reversal. (BJC Br. 22-24.) The Findings at issue relate to REA 54, MACTEC's "haul road claim," which sought $426,400.00 for the impact of money and time lost from mandated one-way traffic on the Project's approximately three-mile haul road, and which the district court ultimately denied. MACTEC used the Project's haul road to transport contour fill and protective cover from the borrow pit to the SWSA 4 site. The district court's specific Findings on the REA provide:

> 318.    On the other hand, BJC cites to only one instance that is based upon Robert Spurling's personal experience. This testimony was based on traveling through the particular area only "*three, maybe four times' during the two-month period affected*."

(ROA Vol. 1, 1401, ¶ 318) (emphasis added).

> 128.    Even on the most productive day (July 16), MACTEC claims that each of its trucks spent at least 15 to 16 minutes per round trip waiting to get past the one-way stretch. MACTEC's Project Engineer, Mark Cade, testified that "the longest period of time that [he] experienced waiting on the flag men" was "fifteen, twenty minutes." In contrast, Robert Spurling testified that any delay was far less ("a couple of minutes at most"). Spurling traveled through that area *on average three times per day*.

(ROA Vol. 1, 1367, ¶ 128) (emphasis added) (internal citations omitted).

BJC asserts that the court's error in setting forth these two contradictory statements—the first of which was actually made by MACTEC employee Mark Cade and was wrongly attributed to Spurling—is prejudicial and warrants reversal of the entire decision. Specifically, BJC claims that because BJC relied so heavily on Spurling's testimony to present its position, the district court's decision to discredit him completely was unfairly prejudicial.

An error is harmless "if one cannot say, with fair assurance . . . that the judgment was not substantially swayed by the error." *Kotteakos*, 328 U.S. at 765.  Despite the district court's misstep in attributing testimony about the haul road to Spurling when it was actually Cade's, this inconsistency was isolated such that the decision was certainly not "substantially swayed by the error." *See id*.  Moreover, the district court actually held for BJC, and against MACTEC, on the haul road claim, making it even less likely that the district court's misstatement prejudiced BJC.  *See Gulf Refining Co. v. Fetschan*, 130 F.2d 129, 135 (6th Cir. 1942) (holding that an alleged error committed by the district court did not prejudice the appellant because the appellant prevailed on the underlying issue to which the error related).  Accordingly, we reject BJC's argument on this issue.

**D.      The district court did not abuse its discretion in finding DuPree qualified to testify as to MACTEC's contour fill claim, and did not err in adopting DuPree's CPM analysis of MACTEC's extended program costs claim**

As explained above, MACTEC hired as its damages expert A. Joseph DuPree, a consultant and "cost and scheduling expert" who had testified as an expert in previous court proceedings.  Prior to trial, DuPree submitted a June 15, 2007 Damages Assessment and a July 20, 2007 Addendum that outlined the substance of MACTEC's claims.  DuPree's analysis applied the CPM approach, which has been accepted by the United States Court of Federal Claims as the most accurate way to calculate delay damages in complex construction projects.  *See Youngdale & Sons Const. Co., Inc. v. United States*, 27 Fed. Cl. 516, 550 (Fed. Cl. 1993).  The Court of Federal Claims has explained the utility of CPM in analyzing construction-related damages as follows:

> In order to calculate delay damages, it is necessary to determine which work items on the . . . project were in the critical path and the time period that these work items remained on the critical path. The reason that the determination of the critical path is crucial to the calculation of delay damages is that *only construction work on the critical path ha[s] an impact upon the time in which the project was completed . . . .* Delay involving work not on the critical path generally has no impact on the eventual completion days of the project.

*See Youngdale*, 27 Fed. Cl. at 550 (quoting *G.M. Shupe, Inc. v. United States*, 5 Cl. Ct. 662, 728 (Cl. Ct. 1984)).

At trial, DuPree underwent two full days of questioning about his Damages Assessment and Addendum. DuPree explained that he "addressed the performance of the project through review of contract documents, estimated prices and actual returns on costs [gleaned from MACTEC's accounting software], scheduled and actual events, and gathering of anecdotal information from the subcontract's performers[, such as MACTEC employees Reid, Foster, Cade, and other design engineering personnel]." (BJC Exs. Vol. 2, 85.) DuPree also based his assessment on information learned from "[d]iscussions held with MACTEC representatives . . . [,] information gathered on the structure of MACTEC's schedules (relationship between/among elements) . . .[, and] meetings with] MACTEC representatives to assess the impacting events affecting the prosecution of the Contract schedule." and their effects as compared to the Subcontract Modifications and pending REAs. (BJC Exs. Vol 2, 85.) According to DuPree, the combination of the September 11, 2001 work suspension, the nearly two years of unusually wet weather, MACTEC's continual Project acceleration, BJC's de-scoping of certain items, and the emergence of unanticipated hot spots, caused MACTEC to suffer more than $5,142,345.92 in damages for unsettled REAs and claims.

The district court admitted and adopted DuPree's testimony over BJC's objections that he was unqualified to serve as an expert on MACTEC's damages, explaining:

> 30. MACTEC proffered Joe DuPree as a cost and scheduling expert. Over the past 30 years DuePree has updated, monitored and prepared construction schedules. As the owner of his own consulting firm[, DuPree Associates], DuPree has developed contract claims in the construction industry associated with acceleration, extended program costs, delays, disruption, differing site conditions, changes in scope, as well as other impact claims. While preparing the extended program cost claim, DuPree performed a critical path method ("CPM") analysis of the SWSA 4 schedules.

31.  BJC objects to DuPree's testimony as an expert witness. The admissibility of expert testimony in federal court is primarily governed by Federal Rule of Evidence 702[,] . . . The reliability of proffered expert testimony must involve an initial determination that the witness seeking to render the opinion is qualified to render an expert opinion in the designated area. Here, DuPree has [thirty] years experience preparing construction claims associated with acceleration, extended program costs, delays, disruption, differing site conditions, changes in scope, as well as other impact claims. He is clearly qualified to give expert testimony in his field of expertise in this case.

(ROA Vol. 1, 1342) (internal citations omitted).

BJC argues that the admission of DuPree's testimony was an abuse of discretion because DuPree was unqualified to opine on MACTEC's contour fill claim, and because he did not apply reliable principles or methods under Federal Rule of Evidence 702 ("Rule 702"). BJC also asserts that the admission of DuPree's testimony unfairly prejudiced BJC because DuPree was MACTEC's only damages expert, and his testimony provided essentially the entirety of the evidence to support MACTEC's two largest claims—the contour fill claim and the extended program costs claim.

*1.  Standard of Review*

We review the district court's decision to admit or exclude expert testimony for abuse of discretion. *United States v. Kalymon*, 541 F.3d 624, 636 (6th Cir. 2008) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)). "A district court 'has broad discretion in the matter of admission or exclusion of expert evidence, and [the court's] action is to be sustained unless manifestly erroneous.' This discretion is at its zenith during a bench trial." *Id*. (quoting *United States v. Demjanjuk*, 367 F.3d 623, 633 (6th Cir. 2004)). Moreover, even if we determine that an expert's testimony was improperly admitted, we are not to disturb the district court's judgment if its admission was harmless. *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 407 (6th Cir. 2007) (citing *United States v. Smithers*, 212 F.3d 306, 315-17 (6th Cir. 2000) (conducting harmless-error analysis

after applying *Daubert* factors to determine whether district court erred in excluding expert testimony)).

Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Before an expert's testimony can be admitted under Rule 702, a district court must determine whether that testimony is reliable. *See Kumho Tire Co.*, 526 U.S. at 147 ("[Rule] 702 imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony ... is not only relevant, but reliable.'") (citing *Daubert*, 509 U.S. at 589). In *Daubert*, the Supreme Court identified certain factors that a court may consider to determine whether an expert's testimony is sufficiently reliable, including: (1) whether a theory or technique can be or has been tested; (2) whether the technique has been subjected to peer review and publication; (3) whether the technique has a known or potential rate of error and the existence of standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance in a relevant scientific community. *Mike's Train House*, 472 F.3d at 407 (citing *Daubert*, 509 U.S. at 593-94); *see also Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 n.5 (6th Cir. 2001). Although the *Daubert* factors are neither definitive nor exhaustive, a court must consider whether they are reasonable measures of reliability in a given case. *Id*. (citing *Nelson,* 243 F.3d at 251).

2. *Contour fill claim*

BJC first claims that DuPree was not qualified to opine on MACTEC's contour fill claim and that he did not apply reliable principles and methods in conducting his analysis. The following Findings by the district court relate to MACTEC's contour fill claim:

252. MACTEC was required to place increased contour fill due to BJC's inaccurate topographical surveys . . . .

257. The Subcontract included a fixed price for "hot spots" to be covered by the cap for only 500 cubic yards . . . .

260. [T]he increase in the volume of the additional soils to cover the "hot spots" required MACTEC to bring in additional clean soils in the local or surrounding areas so that they could maintain grade per the design . . . .

262. The contour fill increased due to the requirement that MACTEC had to extend the cap to cover radiological "hot spots" beyond 500 cubic yards . . . .

266. Joe DuPree determined through interviews with MACTEC's project personnel and review of the project documentation that MACTEC overran its estimated quantity of contour fill due to BJC's failure to provide accurate topographical information to MACTEC.

267. DuPree also identified that there were other BJC impacts that caused MACTEC to place more fill than expected. For instance, the frequency of unanticipated hot spots caused MACTEC to add more fill to achieve its grades and slopes on the Project.

268. DuPree relied upon MACTEC's geotechnical engineers to provide him with the quantities of expected contour fill and compared those quantities against the actual quantities of contour fill placed by MACTEC. MACTEC's geotechnical engineers performed a take-off of the as-built drawings to determine the actual contour fill placed on the Project by MACTEC and gave that information to DuPree. DuPree relied upon the actual quantities placed by MACTEC based upon MACTEC's internal engineers' take-off quantities.

270. DuPree calculated MACTEC's contour fill claim by multiplying the price per cubic yard of contour fill against the cubic yards of additional fill MACTEC placed on the Project as a result of BJC's impacts . . . his calculation produced the total burdened costs associated with MACTEC's contour fill claim of $2,736,964.

(ROA Vol. 1, 1390-92) (internal citations omitted).

BJC argues that DuPree was not qualified to testify about the engineering analysis necessary to evaluate MACTEC's contour fill claim and that the court abused its discretion in basing its finding for MACTEC "entirely" on DuPree's testimony and a "brief e-mail about working on a weekend with no connection to the . . . claim." (BJC Br. 27.) BJC also claims that the court erred in relying on DuPree's testimony because his "entire report and testimony . . . parrot[ed] oral hearsay from unattributed MACTEC employees and paraphrase[d] two documentary exhibits." (BJC Br. 31.) We find BJC's arguments to be without merit.

In the Addendum to MACTEC's original Damages Assessment, DuPree explained that the MACTEC's proposed damages for the contour fill claim were based on:

> The conditions of bid and subsequent performance of the work seem to have been influenced in large part by significant information for the bid bases, changes in site conditions, frequent additions/changes to scope, directed changes in methods, and procedural alterations . . . throughout the [P]roject.

(MACTEC Addendum, ROA Vol. 1, 137.) At trial, DuPree testified about the cost impacts that resulted from the added contour fill, and in doing so, he relied on MACTEC's engineers to give him the projected quantities of contour fill in MACTEC's bid as compared to the actual quantities of fill used. DuPree also plotted BJC-caused impacts—various unsettled REAs—against previously identified "critical" work items, to illustrate disruptive effects on MACTEC's work on the critical path as a whole. In this way, DuPree clearly set forth evidence that the changes in site conditions and BJC's flawed topographical maps and data forced MACTEC to increase the necessary contour fill as well as the size of the overall cap.

We have held that "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact." *Davis v. Combustion Engineering, Inc.*, 742 F.2d 916, 919 (6th Cir. 1984) (explaining "[t]he fact that a proffered expert may be unfamiliar with pertinent

statutory definitions or standards is not grounds for disqualification.  Such lack of familiarity affects the witness'[s] credibility, not his qualifications to testify.") (citing *Ellis v. K-Lan Co., Inc.*, 695 F.2d 157, 161 (5th Cir. 1983)).  Moreover, Federal Rule of Evidence 703 ("Rule 703"), expressly provides that, ". . . [i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. . . " Fed. R. Evid. 703; *see Trepel v. Roadway Exp., Inc.*, 194 F.3d 708, 717 (6th Cir. 1999) (noting that Rule 703 has been interpreted to allow hearsay into evidence to establish the basis for an expert's opinion).  MACTEC submitted substantial evidence showing that such information is routinely used by cost and scheduling experts testifying in construction litigation, *see, e.g.*, *Youngdale*, 27 Fed. Cl. at 551 (noting that expert's report was based in part on daily reports, project correspondence, interviews with those responsible for managing the contract, and other sources).  Further, BJC was entitled to cross-examine *all* of DuPree's various informational sources at trial.  Thus, should BJC have wanted to challenge the credibility of the information that the sources provided to DuPree, it certainly had the opportunity to do so.  Accordingly, applying the foregoing standards, DuPree's reliance on interviews of MACTEC employees and other data relayed to him second-hand was proper, and the district court did not abuse its discretion in admitting his testimony on the contour fill claim.

3.  *Extended program costs claim*

BJC also contends that DuPree was not qualified to opine on MACTEC's extended program costs claim and that his methodology in calculating the damages for that claim was unreliable because he did not properly perform a CPM analysis.  The following Findings related to DuPree's testimony are germane to the resolution of MACTEC's extended program costs claim:

275.    Joe DuPree . . . also identified a category of damages sustained by MACTEC associated with extended program costs.  MACTEC incurred these additional program costs at the end of the Project because of the various BJC impacts identified by DuPree which impacted the critical path established in MACTEC's second baseline schedule.

276.    These BJC impacts forced MACTEC to perform its originally scheduled work in a different time period which was hampered by unexpected weather impacts . . .[which] significantly impacted MACTEC's ability to perform its originally scheduled work . . . .

277.    DuPree determined through his critical path analysis that MACTEC's re-baselined schedule's critical path ran through the cap work which also included the WTF and the DGT.

279.    As a result of these BJC-responsible impacts, I find that BJC is responsible to MACTEC for damages sustained for extended site overhead from October 30, 2004 through July 5, 2005.

(ROA Vol. 1, 1392-93) (internal citations omitted).  The district court ultimately rewarded MACTEC $916,300.00, and calculated that it was entitled to an additional $50,208.22 in prejudgment interest on that amount (awarded at ten percent per annum) for the time period ranging from October 30, 2004 through July 5, 2004, as well as interest at $251.04 from January 1, 2008 through the day the judgment was entered.

When establishing damages, "'[t]he claimant bears the burden of proving the fact of loss with certainty, as well as . . . the amount of loss with sufficient certainty so that the determination of the amount of damages will be more than mere speculation . . . .'" *Wilner*, 23 Cl. Ct. at 248 (citing *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 762 (Fed. Cir. 1987) (quoting *Willems Indus., Inc. v. United States*, 295 F.2d 822, 831 (Cl. Ct. 1961))).  It is well settled that the damages award must be sufficient to "place the injured party in as good a position as he or she would have been had the breaching party fully performed."  *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1562-63 (Fed. Cir. 1997).  Damages for breach of contract must be reasonably foreseeable and contemplated at the time of the contract's execution.  *Cal. Or. Broad., Inc. v. United States*, 74 Fed.

Cl. 394, 405 (2006). Remote or consequential damages are not recoverable. *See CCM Corp. v. United States*, 15 Cl. Ct. 670, 671 (Cl. Ct. 1988) (citing *N. Helex Co. v. United States*, 207 Ct. Cl. 862, 886-88 (Ct. Cl. 1975)). However, "[a] claimant need not prove his damages with absolute certainty or mathematical exactitude." *Ace Constructors*, 70 Fed. Cl. 253, 274 (Fed. Cl. 2006) (quoting *Wunderlich Contracting Co. v. United States*, 173 Ct. Cl. 180 (Ct. Cl. 1965 (citing *Houston Ready-Cut House Co. v. United States*, 119 Ct. Cl. 120 (Ct. Cl. 1951)). "It is sufficient if [a claimant] furnishes the court with a reasonable basis for computation, even though the result is only approximate." *Id. (*quoting *Wunderlich Contracting*, 351 F.2d at 968). Further, the Federal Claims Court has explained that when using CPM analysis, "the only way to accurately assess the effect of the delays alleged . . . on the . . . project's progress is to contrast updated CPM schedules prepared *immediately* before and *immediately* after each purported delay." *Blinderman Constr. Co.*, 39 Fed. Cl. at 585.

BJC argues that a simple review of DuPree's Damages Assessment and his trial testimony confirms that DuPree's CPM damages analysis was inaccurate. Specifically, BJC contends that although DuPree identified Project elements on the critical path in his damages report, he failed to analyze any schedule updates submitted by MACTEC following the July 2002 Second Baseline, and did not identify or quantify specific delays or assess causes of any variations between MACTEC's actual progress and the parties' agreed-upon schedule. MACTEC counters that DuPree's CPM analysis was limited to a review of the Baseline and the Second Baseline because given BJC's constant rejection of MACTEC's weekly proposed CPM schedules, its continuing threats of termination, the constantly changing site conditions, and the de-scoping of the Subcontract, MACTEC could not maintain accurate CPM schedule updates that DuPree could use. MACTEC also contends that because BJC's bad-faith conduct caused MACTEC's inability to maintain an accurate CPM schedule, BJC cannot now argue that DuPree's proposed damages were inaccurate.

In support of its claim, MACTEC relies principally on *Fortec Constructors v. United States*, where the United States Claims Court addressed the validity of a contractor's time-extension claims under a contract awarded by the United States Army Corps of Engineers. 8 Cl. Ct. at 492. The contract required Fortec to create a baseline schedule, which the government approved before Fortec broke ground. *Id*. at 504. Over the course of the project, Fortec requested a number of time extensions for weather-related delays and numerous design changes, but because the project was estimated to take less than one year, the parties implemented only a single formal schedule update, which failed to account for any delays in work that had been performed prior thereto. *Id*. The government subsequently relied on the one outdated updated schedule to deny Fortec's subsequent time-extension request, but the claims court ultimately awarded Fortec its requested breach-of-contract damages, explaining:

> Despite the obvious failure of both parties to use the CPM for scheduling purposes during construction, the government now claims that the additional work [the contractor] was required to perform does not justify any contract time extensions, since the CPM does not show that any of the additional work was on the project's critical path . . . . *The critical path changed from that depicted on the CPM diagram introduced into evidence. The [government], however, refused to grant time and adequate time extensions and authorize revisions to the CPM to reflect the changed performance critical path. As a result, it is impossible to determine from the CPM diagram whether a particular activity was critical or non-critical, on schedule or behind schedule.* Further, the [government] failed to even consider several of [the contractor's] requests for additional compensation and time extensions after the project was completed. [The contractor] could then only with the concurrence of the [government] as to the time to be added . . . . Accordingly [the contractor] was unable to update the CPM during construction. *This inability caused by the [government's] failure to act in a timely fashion should not now be used as a sword against [Fortec].*

*Fortec*, 8 Cl. Ct. at 505-06 (emphasis added).

In its Supplemental Brief submitted following oral argument, BJC asserted that *Fortec* is factually inapposite, and that, instead, our analysis should be guided by the reasoning applied in the more recent case of *George Sollitt Construction Co. v. United States*, 64 Fed. Cl. 229, 236 (Fed. Cl.

2005). In *George Sollitt*, Sollitt, a contractor, sued the government for claims of equitable adjustment arising during a three-phase construction contract that required Sollitt to submit monthly updated CPM schedules for the government's approval. *Id*. Over the course of the Project, the government continually denied all of Sollitt's requests for time extensions, and argued at trial that Sollitt's proposed damages for equitable adjustment were inaccurate because the underlying CPM schedules were outdated *Id*. at 248-49. Relying on *Fortec*, Sollitt countered that the government could not benefit from the inaccurate CPM schedule updates where the government's untimely review of the proposed extensions rendered the "CPM schedule updates inaccurate." *Id*. at 249 n.14. However, the *George Sollitt* court deemed *Fortec* distinguishable, and found in favor of the government, explaining:

> [s]ubmitting monthly updated CPM schedules was a contract requirement[,] *Sollitt may not excuse its failure to enter delaying events into the CPM schedule updates because of the [government's] alleged failure to grant timely extensions based on those delays*. If Sollitt's updated CPM schedules are of limited use in meeting its burden of establishing the critical path of the project, *Sollitt is now facing the consequences of its own performance of the contract requirement to provide updated CPM schedules.*

*Sollitt*, 64 Fed. Cl. at 251 (emphasis added).

As in *George Sollitt*, here, MACTEC, not BJC, attempted to rely on its outdated Baseline and Second Baseline to establish its damages for its extended program costs claim, such that "the equitable concern expressed in *Fortec* does not apply with the same force." 64 Fed. Cl. at 249 n. 14. Further, as was the case in *George Sollitt*, the Subcontract contained an express clause requiring MACTEC to give BJC numerous updates (weekly, *etc.*) on the Project's progress, a situation distinguishable from that in *Fortec*, where the project was short-term, and the parties did not contract for regular schedule updates. However, *George Sollitt* is not precisely on point either. Unlike the situation in *George Sollitt*, where the contractor failed to adhere to its contractual obligation to submit regularly updated schedules, the record reflects that MACTEC (through Foster) complied with the Subcontract's

requirements, but that all of the updates were denied, forcing MACTEC into a continually accelerated state. Further, in *George Sollitt*, the court noted that "Sollitt sometimes failed to justify its requests for time extensions with adequate and timely documentation," and that Sollitt did not show that the government unreasonably delayed its granting of time extensions. *Id*. at 251 n.16. In contrast, here, the district court expressly found that even where MACTEC justified its requests for time extensions with evidence of unseasonably wet weather, BJC's flawed topographical surveys, and BJC's continued de-scoping, MACTEC was forced to accelerate the Project at all costs.

As we noted above, MACTEC bears the burden of presenting reasonably satisfactory proof of its damages on its extended program costs claims. *See Ace Constructors*, 70 Fed. Cl. at 274. Thus, where through no fault of MACTEC's, the ideal method of cost data was unavailable, MACTEC properly submitted the closest thing to it—CPM damage estimates based on the Baseline and Second Baseline, which it supported through witness testimony, expert testimony, and other substantiating data. *See id*. Moreover, we also note that BJC has not appealed the district court's conclusion that it acted in bad faith throughout the course of the Project. We see no reason why we should allow BJC to rely on its own bad faith refusals to authorize MACTEC's attempts to comply with the Subcontract's scheduling requirements as a means of rebutting MACTEC's expert testimony, especially where BJC did not even try to propose a better methodology or attempt to substantiate its claim that MACTEC's damages were flawed by presenting testimony by its own competing expert.

**E.     The district court did not err in rejecting BJC's requested damages**

BJC also asserts that the district court erroneously rejected seven of its nine counterclaims, requesting $485,480.00 in damages, based on the impermissible legal conclusion that because the DOE reimbursed BJC's costs, it had no recoverable damages. BJC explains that the district court erred in Findings 465 and 505, which state that "BJC has been reimbursed by the DOE for all costs that it is

claiming against MACTEC in the lawsuit," and that "BJC has suffered no damages," (ROA Vol. 1, 1439, 1450). According to BJC, such a theory fails as a matter of public policy because if a contractor were barred from seeking reimbursement for costs already reimbursed by the government, "[a]ny subcontractor finding it financially onerous to perform its subcontract could simply breach and abandon it at will, secure in the knowledge that the other contracting party, as a cost-reimbursable contractor, would have no recoverable damages, and thus no claim against the breaching subcontractor." (BJC Br. 41.) MACTEC counters that BJC's assertion is baseless because the district court actually denied BJC's counterclaims on other grounds—namely, because MACTEC's claim for the Subcontract balance and retainage included a credit for some of BJC's claims, and because BJC was not entitled to damages for backcharges where it impermissibly took control over the Subcontract and certain aspects of MACTEC's performance thereunder. Further, MACTEC explains that the district court's failure to address explicitly each BJC's seven counterclaims was not clearly erroneous, and regardless, does not warrant reversal of the decision.

In rejecting BJC's claims for damages, the district court found:

650. In addition to the conclusion reached above that BJC cannot backcharge MACTEC for BJC's changes to MACTEC's means and methods, I find that BJC breached its implied duty not to interfere with MACTEC's performance . . . .

653. I find that BJC interfered with, and changed, MACTEC's performance by directing MACTEC to perform a BJC-designed pumping test in lieu of MACTEC's identified and BJC-approved testing procedures of operating the DGT and WTF as specified in the Subcontract and the O&M Plan . . . . It is unfair and inequitable for BJC to reap the benefits of its interference by now backcharging MACTEC for the BJC directed testing and alleged defective work when MACTEC had a reasonable approved and contractually-specified testing program in place that would have reached the same data and recommended adjustments as BJC.

(ROA Vol. 1, 1499-1500.) From the above Finding, it is readily apparent that the district court did not base its rejection of its requested damages solely on BJC's reimbursement by the DOE, but rather, on its continued interference with MACTEC's work.

Moreover, the lower court's failure to consider separately each of BJC's individual counterclaims also does not warrant reversal. *See Zack v. C.I.R.*, 291 F.3d 407, 412 (6th Cir. 2002) ("When evaluating whether the requirements of Rule 52(a) have been satisfied, we do not insist that trial courts make factual findings directly addressing each issue that a litigant raises. . . findings are to be liberally construed in support of a judgment, even if [they] are not as explicit or detailed as might be desired.") (internal citations omitted). In rejecting BJC's counterclaims, the district court concluded that BJC was not entitled to backcharge MACTEC for work that BJC improperly wrested from MACTEC, and that, regardless, BJC failed to meet its burden to establish the value of that work. Thus, although the court did not specifically address each one of BJC's counterclaims, this analysis is sufficient to allow us to conduct a thorough appellate review.

**F.      The district court did not err in finding that MACTEC was entitled to recover on its claim for additional vent-layer stone**

BJC also contends that the district court erred in finding for MACTEC on its additional vent-layer stone claim. BJC argues that the district court erred in granting MACTEC's requested damages, which were based on acceleration claims stemming from inclement weather in 2003 and 2004, because: (1) Modifications 32 and 10 already reimbursed MACTEC for all of its weather-related acceleration costs (at least those incurred through May 24, 2004); and (2) MACTEC employee, Matt Foster, gave inconsistent testimony on the vent-layer stone claim such that the district court's conclusion was not based on substantial evidence.

*1. Modifications 10 and 32*

The parties' dispute over whether MACTEC can recover on the vent-layer stone claim centers on whether Modifications 10 and 32 already compensated MACTEC for any damages it suffered from the accelerated schedule.  As explained above, Modification 32, reimbursed MACTEC for a number of its REAs, among them, REA 39, "Acceleration in Lieu of Time Extension for Weather Impacts,"[1] for which MACTEC received an additional $300,000.00 lump-sum payment for all work acceleration (essentially overtime pay) that occurred through May 24, 2004, the date on which MACTEC completed its fieldwork.  (Modification 32, BJC App. Vol. 2, 154, 162.); *see supra* Part I.A.2.b.  Further, Modification 10 increased MACTEC's compensation for "Contaminated Vegetation Grinding" and revised MACTEC's "Scope of Work" accordingly.  (*See* Modification 10, BJC App. Vol. 1, 48-49.); *see supra* Part I.A.2.b.

### a.      Standard of review

As a threshold matter, we must resolve the parties' disagreement about the appropriate standard of review.  BJC asserts that the district court's misinterpretation of the plain language of Modifications 32 and 10 was an error of law that is subject to de novo review.  BJC claims that because the district court never indicated that it found Modification 32 to be ambiguous, and Modification 32 expressly includes REA 39, the court erred in considering MACTEC's extrinsic evidence that the bad weather in 2003 and 2004 required it to use more vent-layer stone than the amount projected in its original bid.

---

[1]As the district court noted, the title of REA 39, "Acceleration in Lieu of Time Extension for Weather Impacts," was the same as that for REA 66.  (ROA Vol. 1, 1353-54.)  However, in addition to claiming weather impacts in a period prior to that addressed by REA 66, REA 39 also included claimed acceleration of MACTEC's work efforts through overtime thereafter, in the same time period as addressed in REA 66—December 9, 2003 through February 20, 2005, minus amounts awarded in previously settled REA, which included costs for premium time projected through May 24, 2004.  To avoid compensating MACTEC for costs that may have been settled in previously settled REAs, the district court recalculated the appropriate damages for the period between September 1, 2004 and February 20, 2005, and awarded MACTEC $101,664.71, plus prejudgment interest on that claim.

MACTEC contends, however, that the district court's reliance on extrinsic evidence to interpret Modifications 32 and 10 suggests that the court determined that the Modifications were ambiguous, making its interpretation of those clauses questions of fact that require the consideration of witness testimony and other extrinsic evidence, and now warrant the application of clear-error review.

"The purpose of contract interpretation is to crystalize the parties' objectively manifested intent, and this may involve the interpretation of specific language or terms, explanation of ambiguities, risk allocation, and sometimes the consideration of extrinsic evidence for limited purposes." *Conoco, Inc. v. United States*, 35 Fed. Cl. 309, 321 (Fed. Cl. 1996). Under the federal law of government contracts, "the plain language of a contract controls, and only language which is reasonably susceptible to more than one meaning may be considered ambiguous." *Omni Corp. v. United States*, 41 Fed. Cl. 585, 591 (Fed. Cl. 1998) (citing *Thermal Elec., Inc. v. United States*, 25 Cl. Ct. 671, 673 (Cl. Ct. 1992)); *see Hills Materials Co. v. Rice*, 982 F.2d 514, 516 (Fed. Cir. 1992). Further, "[i]t is a familiar principle of contract law that the parties' contemporaneous construction of an agreement, before it has become the subject of a dispute, is entitled to great weight in its interpretation." *Omni Corp.*, 41 Fed. Cl. at 591 (citing *Blinderman Constr. Co., Inc. v. United States*, 695 F.2d 552, 558 (Fed. Cir. 1982)). As explained above, we review a lower court's factual determinations for clear error and contract interpretations based thereon de novo. *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 653 (6th Cir. 1996).

Modifications 32 and 10 both include the following language releasing BJC from making further payments to MACTEC on REAs already compensated in the Modifications:

> This Subcontract is modified to incorporate the additional agreements between the parties and the SUBCONTRACTOR is required to sign this document. This Modification provides complete and final compensation for the changes listed herein. The SUBCONTRACTOR hereby releases CONTRACTOR from any and all liability under this Subcontract for further adjustments attributable to any fact or circumstances

resulting from the SUBCONTRACTOR's request(s) for equitable adjustment listed herein or by reason of the cumulative impact of all previously executed Modifications to this Subcontract.

(*See, e.g.*, Modification 10, BJC App. Vol. 1, 48.) Nonetheless, Modification 32 never explains the substance of REA 39, nor did the parties attach REA 39 to Modification 32—it merely states that it is in response to REA 39, and that its title is "Acceleration in Lieu of Time Extension for Weather Impacts." (Modification 32, BJC App. Vol. 2, 154, 162.)

As an additional matter, we must also consider the contested Modifications in the broader context of the parties' overall Subcontract. *Cleek Aviation v. United States*, 19 Cl. Ct. 552, 554 (Cl. Ct. 1990) (noting that "a contract must be interpreted to carry out the intention of the parties as manifested by the contract as a whole"). The district court concluded that throughout the Project, the parties made several "constructive changes" to the Subcontract without issuing formal change orders, and that BJC regularly waived certain contract requirements. In this way, the plain language of the parties' *overall* Subcontract did not necessarily constrain their course of dealing, compelling the district court to refer to extrinsic evidence—*i.e.*, witness testimony, emails, letters—to interpret it. *See Campbell v. Potash Corp. of Saskatchewan, Inc.*, 238 F.3d 792, 797 (6th Cir. 2001) (affirming the district court's interpretation of a contract holding that the clause in dispute was *unambiguous* as a matter of law, but also considering extrinsic evidence in adopting plaintiffs' interpretation thereof).

Therefore both the district court and this Court must look beyond the four corners of the Subcontract and its attachments, and the extrinsic evidence indicates that REA 39 was intended to compensate MACTEC for costs that differed from those covered by REA 69. Accordingly, we review the court's Findings as to the Modifications for clear error and its contract interpretations based thereon de novo. *See Golden*, 73 F.3d at 653.

     b.    *Analysis*

In granting MACTEC damages on its vent-layer stone claim, the district court explained:

> 86.  Due to BJC's refusal to grant time extensions for unusually severe weather, MACTEC experienced problems placing the six inch vent layer underneath the cap. By design, the six inch stone vent layer was to be placed over the massive landfill area that was to be capped.  The Project experienced unusually severe weather during the time period that MACTEC placed the vent layer, calendar years 2003 and 2004.  This unusually severe weather required the placement of additional vent[-]layer stone because the stone would sink into the sloppy mud and into the contaminated wood chips, thereby requiring MACTEC to place an additional 6 inches of clean stone on top of the already placed, but now contaminated stone.  Because of BJC's acceleration directives MACTEC could not allow the site to dry out before proceeding with its work as planned.  The unusually wet conditions also made the operation of equipment very difficult because the equipment would sink into the placed stone causing the stone to become contaminated by previously-spread wood chips and contaminated surface mud. This caused the need to place additional vent[-layer] stone . . . .

(ROA Vol. 1, 1358, ¶ 856.)  As noted above, BJC asserts that Modifications 32 and 10 already compensated MACTEC for effects of "unusually severe weather," and MACTEC was not entitled to collect even *more* damages for the new weather-related claims set forth in REA 69.

As a threshold matter, we note that although the district court resolved this claim in MACTEC's favor, unlike its thorough analysis deeming portions of REA 66 duplicative of REA 39, (*see* ROA Vol. 1, 1355-57), the court set forth no Findings or Conclusions about whether it found that portions of REA 69 were duplicative of costs previously accounted for by REA 39, one of the three REAs encompassed by Modification 32.  However, the issue of duplication was fully briefed before the district court.  Thus, barring the presentation of any contrary evidence by BJC, we have no reason to believe that the costs were duplicative, and we adhere to the district court's conclusion that MACTEC was entitled to recover damages for the claims asserted in REA 69.  Regardless, the record contains substantial evidence of the difficult working conditions MACTEC experienced from the excessively wet weather in 2003 and 2004, and BJC's continuing bad-faith failure to grant MACTEC's

legitimate requests for time extensions for unusually severe weather, all of which support MACTEC's recovery for REA 69.

Although this Court raised questions about the dates covered by the REAs during oral argument, the parties appear to agree that Modifications 32 and 10 compensated MACTEC for most of MACTEC's weather-related *labor* costs—at least all but for the work MACTEC performed from May 25 through May 31, 2004—while REA 69 dealt more with the costs of the additional materials, (upwards of $500,000 according to its original estimates), plus prejudgment interest on that amount. Thus, we affirm the district court's award of $814,850.00 in damages to MACTEC on the vent-layer stone claim.

### 2. *Testimony of Matt Foster*

BJC also asserts that the district court erred in granting MACTEC damages on its vent-layer stone claim because Foster provided inconsistent testimony at deposition and trial regarding MACTEC's vent-layer stone losses such that the damages award for the vent-layer stone claim were not supported by substantial evidence. BJC asserts that at deposition Foster testified that the vent-layer stone claim was based on the presence of wood chips rather than the inclement weather, while at trial, he asserted that the claim was derived only from weather-related difficulties. MACTEC counters that Foster's testimony was consistent, and that, regardless, any inconsistency did not render the court's findings on the vent-layer stone claim clearly erroneous.

At deposition, Foster described REA 69 as a consequence of an early Subcontract Modification under which MACTEC was required to grind up contaminated trees and vegetation and "spread the contaminated chips" in areas to be covered by the SWSA 4 cap. (Foster Dep., ROA Vol. 1, 226.) Foster explained that because much of the stone was lost in the chips, REA 69 was an estimate of "how much extra stone we ended up having to put down as a result of putting those

ground-up chips there." (ROA Vol. 1, 226.) At trial, Foster testified that REA 69 sought damages for the "[a]dditional vent layer that was required for the project as a result of the conditions that were at the site at the time we were placing it." (Tr. Vol. 2, 170.) Foster further explained that the weather and other external impacts caused MACTEC's stone to "mix with the soil" and sink into the sub-grade—the ground-up chips. (Tr. Vol. 2, 170.) Finally, Foster also elaborated on the costs for the additional equipment MACTEC required to place the stone, and the additional compensation for approximately twenty-five days of overtime.

Foster's testimony was later confirmed by the testimony of MACTEC Project Superintendent, Jim Bowman, who was on the Project site every day and stated that MACTEC lost much of its original vent-layer stone because of the unusually severe weather, explaining,

> Doing the cap was during like a real bad rainy season. Like we had – check the daily reports, we had a lot of rain days, which made the cap, well, made a sloppy mess. . . after you have the clearing and grubbing, you have nothing but dirt, you don't have any grass seed or nothing in there. What happens, it rains on it and just turns it into a, lack of a better term, a mud hole.

(Tr. Vol. 2, 24, 69.) Bowman noted that, "Now, when we put the stone, the vent[-]layer, down on the cap, as I said before, if it was muddy . . . the stone would mix with the mud and the wood chips; that didn't count. What counted is, if you had six inches of clean vent[-]layer stone." (Tr. Vol. 2, 84.)

Foster's testimony was not inconsistent such that the court clearly erred in relying thereon to award MACTEC's requested damages on the vent-layer stone claim. Considered together, Foster and Bowman's testimony supports a finding that MACTEC's original projection for the vent-layer stone it would need for the Project failed to factor in the muddy sub-grade, which, when combined with the soft, ground-up vegetation chips during several months of bad weather, caused the vent-layer stone to sink much lower than either party had anticipated. Nonetheless, even assuming arguendo that Foster gave inconsistent testimony, such an inconsistency would not render clearly erroneous the court's

Findings on the vent-layer stone claim where such inconsistencies "affect the weight of the testimony," but not its admissibility. *United States v. Daniels*, 377 F.2d 255, 258 (6th Cir. 1967).

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's decision.